**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 1, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EDGAR F. KAISER, JR.,

      Plaintiff - Appellant/Cross-
      Appellee,

v.

PATRICK D. BOWLEN, PDB
SPORTS, LTD., a Colorado limited
partnership, BOWLEN SPORTS,
INC., an Arizona corporation, doing
business in Colorado; PDB
Enterprises, INC., a Colorado
corporation,

      Defendants - Appellees/Cross-
      Appellants.

Nos. 05-1050 and 05-1079

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 99-M-2458 (BNB))**

---

G. Stephen Long (John D. Phillips, William E. Quirk, and Bennett L. Cohen with
him on the briefs), Shughart, Thomson & Kilroy, P.C., Denver, Colorado for the
Plaintiff - Appellant/Cross-Appellee.

Sean Connelly of Hoffman, Reilly, Pozner & Williamson, LLP, Denver, Colorado
(Daniel M. Reilly and Wendy B. Fisher of Hoffman, Reilly, Pozner &
Williamson, LLP, Denver, Colorado; Richard P. Slivka, Denver Broncos Football
Club, Englewood, Colorado; with him on the briefs), for the Defendants -
Appellees/Cross-Appellants.

Before **LUCERO**, **BALDOCK,** and **HARTZ**, Circuit Judges.

**LUCERO**, Circuit Judge.

If sport be a metaphor for life, then surely the sale of a National Football League franchise must be like the game itself. Sophisticated businessmen, armed at the elbow with teams of experts, including transactional lawyers, advance their offensive and defensive strategies towards the goal of obtaining a contract, shaking hands, and sealing the deal. When the ink is dry, the game is over. If a dispute arises, our role, like that of a referee, is to ensure that the parties live up to their agreements, follow the law, and play by the rules.

Fourteen years after the 1984 sale of the majority interest of the partnership that owned the Denver Broncos, Edgar Kaiser, the appellant in the present proceedings, brought suit under the contract he entered into with Pat Bowlen. This appeal is a continuation of that litigation. In the district court, Kaiser claimed that Bowlen: (1) breached a warranty in the contract by purchasing the majority interest as a nominee for his family's company; and (2) violated a contract term that gave Kaiser a right of first refusal to buy back an interest equivalent to one offered to former Broncos' quarterback John Elway. A jury rejected the first claim but found in Kaiser's favor on the second.

The jury's first determination – that Bowlen did not violate the warranty in the contract – should not be upset. Contrary to Kaiser's objections, the jury instructions were proper and Bowlen was not judicially estopped from arguing that he did not violate the warranty. However, the jury's verdict that the defendants breached the right of first refusal is contrary to governing Colorado law. That preferential right did not give Kaiser legal entitlement to acquire stock in a parent corporation, which is all that Elway was offered, and therefore the right to first refusal does not apply. Thus, we **AFFIRM** the jury verdict in favor of Bowlen on the breach of warranty claim, but **REVERSE** the decision not to grant judgment as a matter of law to Bowlen on the right of first refusal claim and **REMAND** the case with instructions to enter judgment as a matter of law in favor of Bowlen and the remaining defendants.

**I**

After having been introduced by the Commissioner of the National Football League ("NFL") to then owners Gerald and Alan Phipps in 1981, Edgar Kaiser bought the Denver Broncos, an NFL franchise, for $30 million. He paid $8 million up front, and agreed to pay the remaining $22 million over time at 12% annual interest. In return, he received the right to operate the Broncos franchise, contracts with players, and all associated assets. Aside from being a fan, Kaiser had no previous involvement with the NFL or any other football organization. Immediately after the transaction, for tax purposes, Kaiser transferred ownership

of the Broncos to a wholly-owned partnership, EFK Sports, Ltd. (the "Partnership").[1]

In his first season as the owner of the team, Kaiser brought in a new coach and the Broncos proceeded to win ten games and tie for first place in their division. Financially, the franchise was less successful: Kaiser reported losses of nearly $1 million, and outside analysts suggested that the franchise's operating losses exceeded that sum. In the second year, team performance declined, the franchise lost several million dollars, and, as if that were not enough, NFL players went on strike. Kaiser's other enterprises suffered substantial difficulties as well, and, as a result of these problems and his continuing debt payment obligations to Gerald and Alan Phipps, he had, by his own description, a "serious cash flow problem."

Faced with these setbacks, Kaiser attempted to turn his newly acquired interest in the Broncos into a financial gain. He entered into negotiations with an outside investor to sell his Partnership for $54 million, but the investor pulled out of the deal because he disputed Kaiser's financial projections.

Undeterred by this failure, Kaiser continued his efforts to turn his ownership of the Broncos into a gaining asset. Bob Adams, a friend of Head Coach Dan Reeves, agreed to lend Kaiser $10 million in a transaction that was

---

[1] Another entity Kaiser wholly-owned, EFK Sports Holdings, also assumed part ownership of the team.

structured to permit Adams to convert the debt into a 39.2% minority interest (the "Minority Interest") in the Partnership. United Bank of Denver also loaned money to the Broncos franchise and to the Partnership. A year later, John Adams, Bob Adams's son and the successor in interest on the loan, and his business partner converted the loan, giving them control of the Minority Interest. All transactions involving the ownership of NFL franchises require league approval, and the league did not immediately approve the conversion. Kaiser continued to own a 60.8% majority share in the Partnership (the "Majority Interest").

In 1983, the third season of Kaiser's ownership, the team did better on the field and, through a savvy trade with the Baltimore Colts, acquired the rights to John Elway, the top pick in the NFL draft and later a Hall of Fame quarterback. It also did better financially, earning nearly $6 million. Despite these successes, Kaiser continued his efforts to sell his investment in the Broncos. He entered into negotiations with Pat Bowlen, a member of a "well-established . . . family," who Kaiser deemed likely to be approved by the NFL as an owner. After several meetings, Kaiser agreed to sell the Majority Interest in the Partnership to Bowlen for $51 million, $26 million in cash and the assumption of $25 million in debt.[2] When taken together with the deal with Adams, this amounted to a 100% return on Kaiser's three-year investment in the team.

---

[2] After the sale went through, the name of the Partnership changed from EFK Sports to P.D.B. Sports.

Just before the deal was to be finalized, however, Bowlen's tax lawyer discovered an impediment. Holding the Majority Interest in the Partnership personally would make Bowlen subject to a substantial tax liability in Canada. This problem could be solved only by transferring ownership of the Majority Interest to a U.S. corporation. However, this could not be done under the original draft of the agreement governing the sale (the "Agreement"), which contained an express prohibition on transfer or assignment. To ensure the sale would proceed, Kaiser agreed to change the provision, and the final version of the Agreement permits Bowlen to transfer the Majority Interest to a subsidiary.[3]

Three other clauses in the Agreement are material to this lawsuit. First, the Agreement contains a right of first refusal ("ROFR") that provides Kaiser with the right to repurchase any part of the Broncos franchise or the Majority Interest that Bowlen may offer to sell to a third party on the same terms as that third party may purchase. Notably, this provision, negotiated at length by sophisticated transactional lawyers, does not include a term applying the stated preferential right to sales of shares in the company to which Bowlen could transfer the Majority Interest under the revised version of the Agreement. Elsewhere in the contract was a standard investment representation that stated that Bowlen "is

---

[3] Under Section 1.01 of the Agreement, a subsidiary is defined as "any corporation or other entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time directly or indirectly owned by such person."

acquiring" the Majority Interest for his "own account . . . and not as a nominee or agent." According to testimony by transactional lawyers involved in negotiating the Agreement, this language was necessary to avoid the effect of certain securities regulations and is included in many similar private offerings, including the agreement between Kaiser and Adams (which did not have a ROFR clause). Finally, the Agreement contains a "survival clause," that provides that all representations and warranties terminate one year after Bowlen took ownership.

In March 1984, the NFL approved Bowlen as an owner and also permitted Adams to assume control of the Minority Interest. On June 1, the transaction officially closed and Bowlen affirmed that all the representations and warranties in the Agreement were true and correct as of that date.

In 1985, Bowlen paid Kaiser the $25.9 million he owed under the Agreement (he had paid $100,000 at closing). To do so, he received loans from Citibank and United Bank of Denver guaranteed by his family's company, Hambledon Estates, Ltd. Bowlen was a partner in Hambledon Estates, sharing equal voting power with his three siblings.

Just as Bowlen began making his payments under the Agreement, Adams and his business partner activated a "buy-sell" clause in their agreement with Kaiser (as part of the Agreement, Bowlen had signed a new partnership agreement that contained the same provisions as Kaiser's agreement with Adams). The "buy-sell clause" gave the owner of the Minority Interest the power to declare a

price for each 1% of the Partnership and force the owner of the Majority Interest to either buy the Minority Interest at that price or to sell his Majority Interest at that price.[4] At the price Adams set, Bowlen had to pay $20 million to acquire the Minority Interest in order to retain his newly acquired Majority Interest in the Partnership.

In response to this new financial demand, Bowlen and his siblings created a company – P.D.B. Enterprises – to purchase the Minority Interest. The new company was owned by Texas Northern Productions ("Texas Northern"),[5] which was in turn owned by Hambledon Estates.

Amid this restructuring, Bowlen failed to transfer the Majority Interest to a U.S. corporation, leaving him open to significant Canadian tax liability. As the owner of a football team, Bowlen probably could not have resisted the urge to describe this mistake as a situation in which "somebody fumbled," as he did at trial. To scoop up this loose ball, Bowlen transferred ownership of the Majority Interest to Texas Northern, and the Partnership filed an amended tax return that treated Texas Northern's ownership of the Majority Interest as retroactively applicable from the date of the Agreement. The Partnership later became

[4] The owner of the Majority Interest had a reciprocal right to name a price and force the Minority Interest either to sell or to buy the Majority Interest at that price.

[5] Texas Northern was renamed Bowlen Sports, Inc. For purposes of clarity, we will refer to it as Texas Northern.

involved in litigation with the Internal Revenue Service about an unrelated issue involving the amortization of player contracts. In deciding in the Partnership's favor, the United States Tax Court noted that Bowlen transferred ownership of the Majority Interest to Texas Northern "subsequently" to his purchase.

Because the NFL did not permit companies like Hambledon Estates, which had interests other than football, to control companies that owned franchise rights, more corporate reorganization became necessary. Hambledon Estates spun off its interest in Texas Northern into a newly created company, Hambledon Sports, Inc., that was 30% owned by Pat Bowlen, with the rest of its shares owned by the Bowlen family. Hambledon Sports owned Texas Northern, an American corporation, which owned both the Minority and Majority Interests in the Partnership.[6]

Over the next decade, the Broncos – with John Elway as their star quarterback – evolved into one of the most successful teams in the NFL. The Broncos appeared in the Super Bowl in 1987, 1988 and 1990, and won Super Bowl XXXII following the 1997/98 season.[7] Before the next season started,

---

[6] Texas Northern is also 1% owned by another Hambledon Estates subsidiary.

[7] We take judicial notice of the dates of the first three of the Broncos five appearances in the Super Bowl with Elway at quarterback. The Broncos failed to win in each of these first three games. Kaiser's attorney expressed during trial that he "only want[ed] to ask about the last two," both victories. Elway understandably responded: "Good."

Bowlen and Elway entered into a Memorandum of Understanding, giving Elway an option to purchase a 10% interest in Texas Northern and to serve as an executive in the Broncos organization. To buy the shares, Elway would only have to pay two-thirds the value of 10% of the equity value of Texas Northern minus $5 million. The memorandum also provided a way for either Elway or Bowlen to end the arrangement – either party could force a sale by Elway for the original purchase price plus $5 million plus 8% interest per annum (the "Put/Call provision").

Elway returned to play the next season, and the Broncos won Super Bowl XXXIII, in which Elway was named Super Bowl Most Valuable Player. He retired after the game and never exercised his option to buy part of Texas Northern.

Later that year, Kaiser filed suit against Bowlen, the Partnership, Texas Northern, and P.D.B. Enterprises, alleging violation of two provisions of the Agreement: the warranty that he was buying the team for his own account by serving as a nominee purchaser for his family and the ROFR clause by offering to sell part of Texas Northern to Elway. Defendants moved for summary judgment, but the district court denied the motion, finding that there were triable issues of fact. It specifically noted that there was a factual dispute as to whether it was appropriate to pierce the corporate veil between Texas Northern and the Partnership to find the ROFR applicable to a sale of stock in Texas Northern.

Although he had advanced a veil piercing argument before summary judgment, and the district court relied on this in making its decision to deny the defendants' motion, Kaiser abandoned this theory in a pre-trial conference and instead argued that the text of the Agreement made the ROFR applicable to the offer of Texas Northern shares to Elway. On return of a jury verdict in favor of the defendants on the breach of warranty claim and in favor of Kaiser on the ROFR claim, both parties filed Rule 50(b) motions for judgment as a matter of law that were denied.

Following the verdict in favor of Kaiser on the ROFR claim, there was a hearing on liability. The district court ordered specific performance and determined that, under the Put/Call Provision, Bowlen had the right to buy back the 10% of Texas Northern Shares at the purchase price plus $5 million and interest.

Both parties appealed. The defendants appealed the verdict against them, and Kaiser appealed both the jury's denial of his breach of warranty claim and the district court's decision on damages in the breach of contract claim.

## II

Much of the trial turned on the interpretation of the warranty provision in the Agreement providing that Bowlen was not serving as a "nominee" for others when he bought the Majority Interest in the Partnership. According to Kaiser's complaint, Bowlen breached this warranty by not buying the team for himself, but instead serving as a nominee for his family's purchase of the Majority Interest,

both at the time of signing and by becoming a nominee after the sale was finalized. In response, Bowlen argued at trial that he did not serve as a nominee, but purchased the Majority Interest for himself and subsequently decided to transfer it to Texas Northern, a company owned by his family. Kaiser brings to us an appeal of the jury verdict in Bowlen's favor and asks us to grant him judgment as a matter of law or to order a new trial. He raises three arguments: (1) Bowlen was judicially estopped from claiming that he did not serve as a nominee because of representations he made in front of the U.S. Tax Court; (2) the district court improperly refused to instruct the jury that Bowlen admitted in Tax Court that he was serving as a nominee; and (3) the district court erred by instructing the jury that the warranty at issue did not survive for one year after the Agreement was signed. We will address these claims in turn.

**A**

Judicial estoppel is a doctrine designed "to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001). In Johnson v. Lindon City Corp., in which we applied judicial estoppel for the first time, we described the doctrine thusly: "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the

party who has acquiesced in the position formerly taken by him." 405 F.3d 1065, 1069 (10th Cir. 2005) (citations and quotation marks omitted). Kaiser's claim that Bowlen was judicially estopped from arguing that he did not violate the warranty that he alone purchased the Majority Interest fails for the simple reason that Bowlen did not take a position in a prior legal proceeding that contradicts the position Bowlen took in the trial in this case.

The district court considered and rejected on the merits Kaiser's Fed. R. Civ. P. 50(b) motion for judgment as a matter of law in which he raised judicial estoppel for the first time. However, it did so in error because Kaiser did not bring a Rule 50(a) motion for a directed verdict raising this issue at the close of evidence. See FDIC v. United Pac. Ins. Co., 20 F.3d 1070, 1076 (10th Cir. 1994) ("failure to move for a directed verdict on this issue bars us from considering whether the district court erred in denying the motion for [judgment notwithstanding the verdict]"). Despite this error, judicial estoppel is "an equitable doctrine invoked by a court at its discretion." New Hampshire, 532 U.S. at 750 (citations and quotation marks omitted). Hence, we are not bound to accept a party's waiver of a judicial estoppel argument and may consider the issue at our discretion. See Bethesda Lutheran Homes & Servs. v. Born, 238 F.3d 853, 858 (7th Cir. 2001) (the doctrine of judicial estoppel "is for our protection as well as that of litigants, and so we are not bound to accept a waiver of it."); Grigson v. Creative Artists Agency L.L.C., 210 F.3d 524, 530 (5th Cir. 2000) ("because that

doctrine protects the judicial system, . . . we can apply it sua sponte in certain instances").

Although we are not bound to abide by Kaiser's waiver, there is simply no reason to apply judicial estoppel here. The Supreme Court has made clear that judicial estoppel is "probably not reducible to any general formulation of principle." New Hampshire, 532 U.S. at 750 (quotation marks omitted). That said, we explained the factors that enter into a judicial estoppel determination in Lindon City Corp:

> First, a party's later position must be clearly inconsistent with its earlier position. Moreover, the position to be estopped must generally be one of fact rather than of law or legal theory. Second, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. The requirement that a previous court has accepted the prior inconsistent factual position ensures that judicial estoppel is applied in the narrowest of circumstances. Third, whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

405 F.3d at 1069 (citations and quotation marks omitted). Before us, Kaiser claims that the position taken by the Partnership in its amended 1984 tax return and later in Tax Court – that Texas Northern owned the Majority Interest at the time of the Agreement for the purposes of tax liability – contradicts Bowlen's position during the trial in this case. The stance taken in the tax return cannot give rise to judicial estoppel: in it, the Partnership is taking a legal position, not a

- 14 -

factual one. Further, we agree with our colleagues in the Third Circuit that judicial estoppel only applies to positions taken in legal proceedings and simply does not apply to statements made in a tax return. See Atl. Limousine, Inc. v. NLRB, 243 F.3d 711, 715 n.2 (3d Cir. 2001).

Nor do Bowlen's statements to the Tax Court change this conclusion. The tax litigation dealt with an entirely separate issue involving the amortization of player contracts, and our record review reveals that neither Bowlen nor the Partnership adopted any factual positions during the tax litigation that contradict the defendants' position in this trial that Bowlen purchased the Majority Interest for his own account and then later decided to transfer the team to Texas Northern. In fact, the Tax Court understood this to be their position from the start. It stated: "Bowlen's purchase of Kaiser's [Majority Interest] occurred on June 1, 1984 . . . . Subsequently, Bowlen transferred [the Majority Interest] to his corporation, Texas Northern Productions, Inc." P.D.B. Sports, Ltd. v. Commissioner, 109 T.C. 423, 425 (1997) (emphasis added). Bowlen did not mislead the Tax Court or the district court about a matter of fact and hence judicial estoppel is inappropriate. See Lindon City Corp., 405 F.3d at 1069.

**B**

In addition to raising a judicial estoppel argument, Kaiser claims that the jury's verdict should be reversed because the district court refused to give a jury instruction he recommended. At trial, Kaiser was permitted to introduce the Tax

Court decision and the Partnership's amended 1984 tax return as evidence that Bowlen purchased the team as a nominee. However, the district court rejected Kaiser's proposal to have this evidence reflected in a special jury instruction that jurors "may infer that the amended return reflects truly and accurately the identity of the taxpayer for the tax period to which the amended return applies." We review the failure to include a proposed instruction for an abuse of discretion and look to the jury instructions as a whole. McKenzie v. Benton, 388 F.3d 1342, 1348 (10th Cir. 2004). "As long as the charge as a whole adequately states the law, the refusal to give a particular instruction is not an abuse of discretion." Id. (citations and quotation marks omitted). Kaiser does not argue that the absence of this instruction renders the instructions misleading as a whole and thus there is no basis for concluding that the district court abused its discretion.

## C

In addition to claiming that the district court failed to give his preferred instruction, Kaiser argues that other instructions the district court did provide were misleading. The district court instructed the jury that the "investment representations in Section 4.08" – the section of the Agreement containing the warranty that Bowlen was purchasing the Majority Interest for his own account and not as a nominee – "were effective only on or before June 1, 1984," the date of Kaiser's sale to Bowlen. This instruction misled the jury, Kaiser argues, because another provision of the Agreement, Section 6.20, required all

representations to survive for one year after the date the Agreement was signed. Kaiser is wrong; the text of Section 4.08 is clear that it is a one-time representation and Section 6.20 does not modify this clear language.

We review de novo jury instructions as a whole "to determine whether the jury may have been mislead, upholding the judgment in the absence of substantial doubt that the jury was fairly guided." Chavez v. Thomas & Betts Corp., 396 F.3d 1088, 1098 (10th Cir. 2005) (citations and quotation marks omitted).

The crucial issue here is whether Section 6.20 should be interpreted to extend Bowlen's warranty in Section 4.08 that he would not act as a nominee or agent for another purchaser for a year after the date the Agreement was signed. Section 4.08 states:

> (b) Acquisition for Own Account. By executing this Agreement, the Purchaser represents and warrants that it is acquiring such Partnership Interest for its own account . . . and not as a nominee or agent. It further represents that it does not have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations in all or any part of such Partnership Interest to any Third Person.

(emphasis added). Section 6.20 states:

> The representations and warranties of each of the parties hereto contained in this Agreement shall survive the Effective Date [of sale] and shall expire, terminate and be of no further force or effect upon the anniversary of the Effective Date in 1985.

The district court determined that, despite the statement in Section 6.20 that all representations and warranties will survive until the one-year anniversary of the

Agreement, the representation in Section 4.08 applied only at the time of sale and instructed the jury to this effect. This is the best interpretation of the contract because the clause is clearly written in the present tense: a representation about how a purchaser of an asset is conducting himself at closing logically could not apply at any time other than at the time of sale. Bowlen did not continue "acquiring" the Majority Interest for a year after the signing of the Agreement - after the deal closed, he had acquired it. Thus, there is no way Bowlen could have "acted as a nominee" in "acquiring" the Majority Interest after the date of sale. Any other suggestion is absurd and is contrary to the text of the Agreement and Colorado contract law, which the parties agree controls interpretation of the Agreement. See Atmel Corp. v. Vitesse Semiconductor Corp., 30 P.3d 789, 793 (Colo. Ct. App. 2001) ("Moreover, a contract should never be interpreted to yield an absurd result.").

The jury instructions properly explained the text of Section 4.08 of the Agreement and therefore were not misleading.

**III**

Right of first refusal provisions are restrictions on alienation: A buyer of an asset must undergo the transaction costs of arranging a sale without knowing whether the previous owner of the asset who has a right of first refusal will come in and take the benefits of the buyer's negotiation. Under Colorado law, as in most jurisdictions in the country, such restrictions are interpreted narrowly. In

- 18 -

this case, Kaiser's right of first refusal specifically applied to two entities: the Majority Interest in the Partnership and the Denver Broncos franchise. John Elway was not offered a stake in either of these entities; he was offered 10% of the shares of Texas Northern, the company that owned the Majority Interest. Theoretically, Kaiser and his team of attorneys could have negotiated for a ROFR that applied to any sale of stock in any parent company that owned the Majority Interest, but they failed to do so. Kaiser has not introduced any evidence that Bowlen violated the ROFR. Accordingly, judgment as a matter of law must be granted to Bowlen on the breach of contract claim.

We review orders denying judgment as a matter of law de novo, applying the same standard as the district court and viewing all evidence in the light most favorable to the non-moving party. Haberman v. Hartford Ins. Group, 443 F.3d 1257, 1264 (10th Cir. 2006). The standard for granting judgment as a matter of law is high: "Unless the evidence so overwhelmingly favors the movant as to permit no other rational conclusion, judgment as a matter of law is improper." Id. (citations and quotation marks omitted).

In 1998, the corporate structure surrounding the Broncos was as follows: (1) the Broncos franchise and assets related to the team were owned entirely by the Partnership; (2) The Majority Interest of the Partnership was owned by Texas Northern; (3) the Minority Interest in the Partnership, which was acquired from Adams, was owned by P.D.B. Enterprises, which was owned entirely by Texas

Northern; (4) Texas Northern was entirely owned by Hambledon Sports. Elway was offered shares in (4), Texas Northern. The text of the Agreement specifically gives Kaiser a right of first refusal over only (1) and (2), the Broncos franchise and the Majority Interest. The ROFR section states:

> In the event that, after transfer to Purchaser of the Partnership Interest in the manner contemplated by this Agreement, Purchaser shall elect or intend to sell or transfer all or any portion of the Partnership Interest thus acquired by Purchaser, or all or any portion of the Broncos franchise, then Purchaser shall promptly notify Seller of such election or intention, whereupon Seller shall have 14 days after the effective date of such notice to notify Purchaser of its election to make such purchase, or to have such transfer made to Seller, on substantially the same terms and conditions as shall have been offered to Purchaser.[8]

(emphasis added). The question presented here is whether the sale of shares in a company implicates a ROFR clause that, by its terms, only applies to assets of that company.

In his motion for summary judgment, Bowlen argued that the ROFR clause did not apply to shares of Texas Northern. Kaiser responded that there were disputed facts as to whether the corporate veil between the Partnership and Texas Northern should be pierced and the district court accepted this argument and

---

[8] Kaiser claims that the ROFR clause also applied to the Minority Interest later acquired by Texas Northern, because the ROFR states "all or any portion of the Partnership Interest thus acquired by Purchaser." Thus, he claims the ROFR governs any part of the Partnership owned by Bowlen or a successor in interest. This argument ignores that the ROFR clause specifically states that it only applies to the Partnership Interest "thus acquired by Purchaser" and hence only applies to the Partnership Interest acquired by Bowlen from Kaiser.

denied Bowlen's motion. Later in the litigation, Kaiser abandoned his veil piercing argument and now argues that the ROFR applies to the sale of Texas Northern shares by its text. He is plainly wrong: the very text of the provision on which Kaiser relies, the rule that rights of first refusal are interpreted narrowly, and the decisions of every court in the country to have considered the issue all point to a determination that the offer of Texas Northern shares did not implicate the ROFR.

Looking at the text of the ROFR, it specifies particular assets – the Majority Interest of the Partnership and the Broncos Franchise – and does not state that Kaiser has a ROFR as to the sale of shares of a parent corporation like Texas Northern. The "all or any portion" language preceding the specific assets does not implicate a sale of shares of Texas Northern; that language modifies the assets mentioned and refers to sales, either in part or in whole, of either the Majority Interest or the Broncos franchise. Kaiser acknowledges this, but claims that the contract could not have referred to Texas Northern because, at the time of the suit, Texas Northern had no involvement with the Broncos or the Partnership. However, the contract did specify that Bowlen could transfer his Majority Interest to a subsidiary corporation, and Kaiser knew that Bowlen intended to do so. Even

so, the ROFR clause did not include any language that made it applicable to shares of the planned subsidiary.[9]

In Colorado, as in other states, rights of first refusal are interpreted narrowly. See In re Estate of Riggs, 540 P.2d 361, 363 (Colo. App. 1975) (holding that clause requiring offers to sell or transfer a company's stock to be offered to the company first does not apply to testamentary transfers because clause must be "strictly construed"); see, e.g., Tenneco Inc. v. Enterprise Prods. Co., 925 S.W.2d 640, 646 (Tex. 1996) ("Sound corporate jurisprudence requires that courts narrowly construe rights of first refusal and other provisions that effectively restrict the free transfer of stock."); LaRose Mkt. v. Sylvan Ctr., 530 N.W.2d 505, 507 (Mich. Ct. App. 1995) ("rights of first refusal are to be interpreted narrowly"); Frandsen v. Jensen-Sundquist Agency, Inc., 802 F.2d 941, 946 (7th Cir. 1986) (applying Wisconsin law and holding that rights of first refusal "is enforceable but only if the contract clearly confers it."). It is also well established as a "basic tenet of American corporate law . . . that the corporation

_____

[9] A comparison of the text of the ROFR provision at issue to the NFL's rules on ownership transfers further substantiates our conclusion that Kaiser does not have a right of first refusal on sales of stock in Texas Northern. Under its constitution, the NFL must approve "any direct or indirect transfer of an ownership interest [in a franchise] or any entity holding a direct or indirect interest in [a franchise]." Due to its broad language, the NFL's rule applies to sales of stock in parent corporation like Texas Northern. That the provision in the Agreement between Kaiser and Bowlen does not have the reach of the NFL's approval provision -- when that provision was or should have been known to all parties -- emphasizes the point that Kaiser simply failed to negotiate for a right of first refusal on sales of stock in parent companies.

- 22 -

and its shareholders are distinct entities" and an "individual shareholder . . . does not own the corporation's assets." Dole Food Co. v. Patrickson, 538 U.S. 468, 474, 75 (2003).

The distinction between a corporation and its assets and the narrow interpretation of ROFR clauses have led most courts considering the question to hold that the transfer of corporate stock does not trigger a ROFR that only applies by its text to the assets of the corporation. See, e.g., U.S. Cellular Inv. Co. of L.A., Inc. v. GTE Mobilnet, 281 F.3d 929, 934-35 (9th Cir. 2002) (applying California law and holding that the sale of stock of the corporate owner of a partnership share does not implicate a right of first refusal that only referred to shares of the partnership itself); Capital Parks v. Southeastern Advertising & Sales Sys., 30 F.3d 627, 629 (5th Cir. 1994) (applying Texas law); LaRose Mkt, 530 N.W.2d at 508; Tenneco, 925 S.W.2d at 644-45; but see H-B-S P'ship v. Aircoa Hospitality Servs., 114 P.3d 306, 313, 315-16 (N.M. Ct. App. 2005) (applying ROFR that governed sale of assets to sale of a stake in a parent business organization because of the existence of an additional, "extremely broad" clause that specifically applied to sale of the parent but noting that the ruling "does no violence" to "the general rule that a sale of a subsidiary by a parent corporation is not a sale of the subsidiary's assets" and does not conflict with decisions "where the plain terms of the contract limited the ROFR to sales of assets [and] courts . . . applied the general rule so that the ROFR was not

- 23 -

triggered."). Thus, it is clear that the ROFR at issue does not apply to sales of shares in Texas Northern.[10]

Finally, applying the ROFR to the offer to Elway would be particularly inappropriate. Texas Northern owns both the Minority Interest and the Majority Interest in the Partnership. However, the ROFR does not apply to the Minority Interest, which amounts to 39.2% of the Partnership, because Texas Northern acquired it from John Adams and his partner after the Agreement was signed. Elway was only offered 10% of shares of Texas Northern, which has no other assets. Because this is less than the amount of the Partnership Texas Northern could have sold to Elway without implicating the ROFR (the full amount of the Minority Interest), Kaiser's argument is effectively that Bowlen's decision to reorganize the corporate structure expanded the scope of the ROFR. Absent some indication in the text of the Agreement, this cannot be. We are not in the business of rewriting or supplementing agreements for parties after a contract is joined.

Given the clear text of the agreement and the clear weight of precedent, even taking all evidence in the light most favorable to Kaiser, there can be no

---

[10] Kaiser raises one other argument as to why the ROFR should apply. He argues that the text of the Memorandum of Understanding between Texas Northern and Elway stated several times that it meant to transfer shares of the "Denver Broncos" to Elway. This loose talk is of no relevance – the memorandum was clear that the only offer was for shares of Texas Northern. Kaiser does not claim, nor could he, that Elway was offered portions of the Denver Broncos franchise or of the Partnership. As explained above, the ROFR provision does not apply to sales of stock in parent corporation, such as Texas Northern.

rational deduction that the defendants violated the ROFR clause by offering

shares to Elway.   Therefore, judgment as a matter of law should be granted to the

defendants.

**IV**

Because the jury instructions were proper and the defendants were not

judicially estopped from offering their defense, the jury's verdict dismissing the

breach of warranty claim is **AFFIRMED**.  However, because the right of first

refusal clause in the Agreement between Bowlen and Kaiser only referred to

assets of Texas Northern, and did not include any term that applied to shares of

Texas Northern, the district court's decision denying judgment as a matter of law

to the defendants is **REVERSED** and the case is **REMANDED** with instruction

to enter judgment as a matter of law in favor of the defendants.  The joint motion

to file attachments is granted.