**Supreme Court**

No. 2013-336-Appeal.
(PC 06-6371)

The Free & Clear Company           :

v.                                 :

The Narragansett Bay Commission et al.    :

NOTICE:   This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

The Free & Clear Company       :

v.                       :

The Narragansett Bay Commission et al.   :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Goldberg, for the Court.**  This case came before the Supreme Court on October 27, 2015, on appeal by the defendant, the Narragansett Bay Commission (NBC), from a judgment for the plaintiff, The Free & Clear Company (Free & Clear), in Providence County Superior Court following a jury award in the amount of $680,277.  For the reasons stated below, we deny the appeal and affirm the judgment.

### Facts and Travel

Founded in 1993, the J.G. Goff's Pub (J.G. Goff's or pub) was a small tavern overlooking the Providence River and the Point Street Bridge in Providence.  The pub was located in a freestanding historic brick building at the Davol Square Complex.  Styling itself as "the neighborhood pub that's not in the neighborhood," J.G. Goff's was a favorite destination among patrons on the way home from their downtown offices and the nearby hospitals, as well as university students and families.

- 1 -

J.G. Goff's was formed, owned, and operated by Free & Clear, an "S" corporation[1] that originally was held jointly by Robert Freeman, Jr. (Freeman) and Stephen Cleary (Cleary). In addition to his ownership interest in Free & Clear, Cleary owned the real estate management company that managed the Davol Square Complex until the late 1990s. Freeman, who sold Cleary his interest in Free & Clear in 1998, was the son of the then-owner of the Davol Square Jewelry Mart, LLC (Davol Square).[2]

The building that housed the pub (Goff Building) was owned by Davol Square.[3] Free & Clear and Davol Square entered into a series of multi-year lease agreements throughout the 1990s. During that time, the liquor license for J.G. Goff's was in the name of Davol Square. This arrangement bred complications when J.G. Goff's attempted to renew its liquor license in 1998, and, due to an unrelated matter involving Davol Square, the pub was forced to close for three weeks until a new license could be procured. The pub encountered a similar problem renewing its liquor license the following year, resulting in an interruption of four months in operations starting in December 1999. To resolve the problem, Davol Square agreed to transfer the liquor license to Free & Clear in exchange for a renegotiation of the lease agreement. The

---

[1] As this Court has noted previously:

> "An 'S' corporation is a preexisting, closely held corporation that elects to be taxed under Subchapter S of the Internal Revenue Code. * * * Generally, once the Internal Revenue Service grants this special tax designation to a corporation, the 'Subchapter S' corporation's income 'is not taxed at the corporate level but is passed through and taxed to its shareholders, in a similar fashion as a partnership.'" DiLuglio v. Providence Auto Body, Inc., 755 A.2d 757, 763 n.4 (R.I. 2000) (quoting 18 Am. Jur. 2d Corporations § 40 (1985)); see also 26 U.S.C. § 1361(a)(1).

[2] Davol Square changed ownership before the events underlying this action occurred.

[3] To distinguish between the physical location and the landlord, we refer to the site on which the Goff Building was located as the Davol Square Complex, while we refer to the company that owned the complex as Davol Square.

new five-year lease commenced on September 1, 2000, and was set to terminate on August 31, 2005. Unlike the previous lease agreements, which had contained renewal options, the new written agreement contained the following provision: "Lessee has no right to extend the term of this Lease, except as is otherwise agreed upon by the Lessor and Lessee in writing."

Also in 2000, J.G. Goff's expanded to a second location in Bristol, which operated until it was sold for $1.35 million in 2007. Meanwhile, the Providence site continued to operate as usual until the end of 2002, when, according to Free & Clear, NBC's nearby construction project began to interfere with its business. The dispute currently before the Court arises from damages caused by the construction project.

In 2001 NBC, a public corporation,[4] commenced its Combined Sewer Overflow Project (CSO), which was designed to prevent overflow raw sewage from contaminating the Narragansett Bay and its estuaries. As part of the first phase, NBC constructed an underground tunnel below the city of Providence, measuring 16,000 feet in length and twenty-six feet in width. The construction of the tunnel required contractors for NBC to perform drilling operations near the Davol Square Complex and the site of the Goff Building. Free & Clear claims that NBC began to prepare for the project in the vicinity of the Goff Building in the last few months of 2002; NBC counters that work in that area did not start until April of the following year. Nonetheless, NBC does not dispute that, by June 2003, the construction began to cause at least some disruption to the pub's business. The construction continued throughout the autumn and into the winter.

On December 5, 2003, NBC's engineers were preparing to position pipes underground at Point Street outside of J.G. Goff's. To stabilize the pipes, the engineers would drive thin sheets

---

[4] See G.L. 1956 § 46-25-4.

of steel known as "H-piles" into the ground until the sheets could not descend further. It was during this process that the ground unexpectedly began to shake. Joseph Pratt, the CSO program manager, who was present at the time, later would testify that, in retrospect, it was his belief that the engineers had damaged the foundation and structural integrity of the Goff Building while driving down the H-piles on December 5.

Four days later, just before opening time on December 9, 2003, Cleary received a telephone call from a pub employee, who reported significant damage to the Goff Building. When Cleary arrived at the pub shortly thereafter, he discovered that the front façade of the building had become displaced and was on the verge of collapsing forward. One of the CSO engineers was on the scene and advised Cleary not to open that afternoon until the damage to the structure could be assessed.

The pub did not open for business on December 9, 2003, and it has not served another customer since that date. Two days later, on December 11, the Building Inspector for the City of Providence declared that the building was unsafe for occupancy and use. At that time, NBC advised Davol Square and Cleary in writing that, "until further advisement from [NBC] or the [B]uilding [I]nspector[,] the J.G. Goff's structure should remain closed to occupation by the public."

On January 30, 2004, the parties reached an agreement (2004 agreement) in which NBC conceded liability for the damage to the Goff Building, promised to make repairs, and agreed to compensate Free & Clear for lost profits "until the [Goff] Building is put back in operation." NBC made an initial lost-profits payment of $15,000 to Free & Clear. Cleary, representatives for NBC, and representatives for Davol Square communicated at various points in 2004 and 2005 without resolution. NBC did not make additional payments to Free & Clear due to a dispute

regarding requested documentation, and the building remained condemned. The Goff Building ultimately was demolished in November 2005. It has not been rebuilt.

On December 8, 2006, Free & Clear filed suit in the Providence County Superior Court, alleging that NBC owed it damages in excess of the $15,000 initial payment. NBC moved for partial summary judgment, which the trial justice denied. The case proceeded to trial on March 4, 2013. Because NBC had admitted liability, the only issue to be resolved at trial was the amount of damages. Central to the case was the time period for which NBC should be held liable. Free & Clear sought damages from October 1, 2002, when it contended that it began to incur losses as a result of the construction, until November 1, 2007, when Davol Square released it from its obligations under the lease and—in counsel's words—"[J.G.] Goff's essentially was pronounced dead." NBC countered that damages should be limited to the period between June 1, 2003, the date it contends that the construction began to infringe upon the pub's business, and August 31, 2005, the termination date of the lease agreement. Other fundamental issues in controversy included the amount of lost profits and the value of the pub. We recount the testimony at trial salient to this appeal.

Cleary was the first witness to testify. He insisted that he never had intended that J.G. Goff's would shut down its business on August 31, 2005, the date the five-year lease was set to terminate. He testified that he had planned to renegotiate the lease with Davol Square. He stated that, in his experience as a property manager, commercial landlords frequently treat the expiration of a lease as a mere negotiating tactic and that he had no reason to believe that he could not renew the lease. Cleary said that he had no plans to close the business even if the lease was not renewed. Rather, he would have relocated J.G. Goff's to a new location nearby.

Cleary then testified as to the impact the construction had had on J.G. Goff's. According to Cleary, in October 2002, NBC commenced "pre-engineering" activities, such as jackhammering, drilling, and digging, on Point Street on the strip of land between J.G. Goff's and the Providence River. NBC's presence in the area near J.G. Goff's increased significantly each month. By December 2002, construction moved directly into the Davol Square Complex. Cleary reported a 45 percent decline in J.G. Goff's fourth-quarter sales from 2001 to 2002, which he attributed to the construction, and stated that, by April 2003, many of his regular customers had stopped frequenting the pub. Beginning in October 2003, a "slurry mixture" from the construction activities began to seep into J.G. Goff's basement, which affected the pub's food-storage equipment and its office records.

Cleary testified that after the structural damage to the Goff Building on December 9, 2003, NBC's contractors informed him that they would develop a plan in the next three to four weeks so that J.G. Goff's could reopen its doors to customers "pretty quickly." He testified that, in reliance upon NBC's representation that it would restore the Goff Building, he opted to wait to reopen rather than relocate the pub. Cleary stated that, had it not been for the 2004 agreement, he would have immediately found a new location for J.G. Goff's. He testified that he would have been able to obtain financing for relocation at that time and identified possible sites that could have housed the relocated pub. Cleary contended that he did not move the pub because NBC had promised that the interruption in operations would be temporary and that J.G. Goff's would be back in business by peak season.

Cleary recalled that representatives from NBC later told him that its engineers had decided to delay work on J.G. Goff's until NBC finished construction around the Davol Square Complex; Cleary initially agreed to this plan. However, communications between Cleary and

NBC's representatives, as well as between NBC and Davol Square, became increasingly strained in subsequent months. In June 2005, the Davol Square property manager, Richard Jaffe (Jaffe), and the new president of Davol Square, Anthony Meyer, informed Cleary that NBC was weighing the option of tearing down the building and constructing a new one. Based on this, Cleary assumed that the demolition of the Goff Building in November 2005 was the first step in the plan to rebuild.

According to Cleary, by the time the building was demolished, he no longer had the means or ability to reopen the pub at another location. He stated that he would not have been able to obtain financing for a business that had not operated in the past two years and that he had lost his customer base and relationships with suppliers. However, he contended that NBC's representations led him to expect that J.G. Goff's eventually would reopen in a new building constructed where the Goff Building once had stood. Cleary testified that, when rebuilding had not commenced by the end of 2007, he concluded that J.G. Goff's would never reopen. At that point, two years after the demolition, he opted to negotiate a mutual general release of Free & Clear's lease agreement with Davol Square. On cross-examination, Cleary testified that, because Free & Clear was an "S" corporation, any money made by the business would be listed on his personal tax returns.

Free & Clear's business appraisal expert, Donald Wisehart (Wisehart), testified at length. Wisehart offered his opinion as to J.G. Goff's lost profits and the value of the business. He explained that professional valuation standards dictate that appraisers approach valuations differently depending on whether the business in question is an ongoing business or a liquidated business. Wisehart elected to treat J.G. Goff's as an ongoing business because it had operated profitably for a decade and had enjoyed a good client base, a liquor license, relationships with

vendors and suppliers, branding, and an assembled work force. According to Wisehart, it would be erroneous to assume that J.G. Goff's lacked a future simply because it had a limited period of months remaining on its lease with Davol Square.

Wisehart explained that, in the course of appraisal, he made "normalizing adjustments" to J.G. Goff's sales revenues, costs, and operating expenses. Such normalizing adjustments allowed him to consider what a "normal" expenditure or revenue item would be in an ordinary year. In so doing, he weighed as anomalies the prior disruption in business related to difficulties in renewing the liquor license in 1999 and 2000. He also considered the success of the second pub located in Bristol. Relying on these calculations, Wisehart testified that J.G. Goff's suffered a total of $1,218,158 in lost profits. With respect to the value of the business, he determined that J.G. Goff's worth, as of December 9, 2003, was $1,038,000.

Wisehart further testified that business expenses are calculated differently when appraising a business than when determining tax liability. He explained that expenses deductible for tax purposes sometimes are not part of the ordinary operating expenses needed to run a business and thus such expenses are omitted from calculations made for valuation. Wisehart stated that an expense may be properly deducted from taxes but may not be a recurring business expense relevant for the purposes of valuation.

After Free & Clear rested its case, NBC moved for judgment as a matter of law on any claim for damages beyond August 31, 2005, the scheduled termination date of J.G. Goff's lease with Davol Square. The trial justice denied the motion and stated that there was sufficient evidence for the jury to consider damages beyond that date.

NBC then presented its own business appraisal expert, Gregory Porcaro (Porcaro), who disagreed with the normalization adjustments made by Wisehart. Based upon information he

received from representatives from NBC, Porcaro concluded that CSO activities did not interfere with J.G. Goff's business until June 2003. Porcaro stated that, after making his own normalization adjustments, he determined that J.G. Goff's lost profits totaled $149,939. He valued the business at zero dollars because the sworn tax return submitted to the United States Internal Revenue Service by J.G. Goff's for the year of 2003 listed the pub's profits at that amount. On cross-examination, Porcaro stated that he had not relied on all of the records that Wisehart had, nor had he met with the pub's management, as Wisehart had done.

NBC also called Jaffe, the property manager for Davol Square, to testify. Jaffe stated that, in 2002, he had approached Cleary about the possibility of buying out the lease but they failed to reach an agreement regarding the buyout price. Jaffe testified that there were no discussions about renewing the lease at that time and that it would have been highly unlikely in 2003 for Davol Square to have agreed to renew the lease. Jaffe indicated that, because there were plans to develop the Davol Square Complex near the Goff Building, any new lease would have excluded access to the outdoor patio area that had been utilized by the pub. On cross-examination, Jaffe acknowledged that, if the building had not been damaged, Davol Square likely would have agreed to continue to rent the premises to J.G. Goff's on a month-to-month basis in 2005, without the patio.

NBC then renewed its motion for judgment as a matter of law on the basis that Free & Clear could not recover damages for the period after its lease terminated. The trial justice denied the renewed motion. The jury subsequently returned a verdict for Free & Clear in the amount of $680,277, and the trial justice added prejudgment interest in the amount of $756,169.92. Judgment entered on March 22, 2013. NBC moved for a new trial, or alternatively, a remittitur to the jury award, which the trial justice denied. This timely appeal followed.

**Issues on Appeal**

NBC raises a bevy of issues on appeal. Of those issues that are properly before this Court,[5] NBC first assigns error to the denial of its motion for a new trial. Second, NBC challenges the refusal by the trial justice to grant a remittitur, which it had sought in the alternative to a new trial. Third, NBC asserts that the trial justice erred in calculating prejudgment interest. Fourth, NBC appeals from the denial of its motion for partial judgment as a matter of law.

**Analysis**

**A. Denial of Motion for a New Trial**

NBC contends that the trial justice erred when he denied its motion for a new trial. When considering a new-trial motion, the trial justice is required to "weigh the evidence and assess the credibility of the witnesses," as if he or she were a "superjuror." Yi Gu v. Rhode Island Public Transit Authority, 38 A.3d 1093, 1099 (R.I. 2012) (quoting Pollard v. Hastings, 862 A.2d 770, 777 (R.I. 2004)). After undertaking this independent analysis, the trial justice must uphold the jury verdict if he or she "determines that the evidence is evenly balanced or is such that reasonable minds in considering the same evidence could come to different conclusions * * *." Id. (quoting Botelho v. Caster's, Inc., 970 A.2d 541, 545 (R.I. 2009)). This Court will not upset that determination unless the moving party demonstrates that "the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." Id. (quoting Izen v. Winoker, 589 A.2d 824, 829 (R.I. 1991)).

---

[5] Among the issues NBC raises on appeal is a challenge to the denial of its pretrial motion for partial summary judgment. However, this Court declines to entertain an appeal of the denial of summary judgment after the Superior Court holds a trial and enters final judgment on the merits of the case. Nationwide Property & Casualty Insurance Co. v. D.F. Pepper Construction, Inc., 59 A.3d 106, 110 n.3 (R.I. 2013).

NBC appeals the denial of its motion for a new trial on four separate grounds. According to NBC, (1) the trial justice erred in instructing the jury; (2) the jury awarded damages based on speculation; (3) the trial justice did not review properly the testimony of Free & Clear's expert witness when issuing his decision; and (4) the doctrine of judicial estoppel should have barred Cleary from asserting that certain expenses were personal and thus not attributable to J.G. Goff's operations. We will address each issue seriatim.

## 1. Jury Instructions

We first consider the challenge to the jury instructions. In charging the jury, the trial justice must "fram[e] the issues in such a way that the instructions reasonably set forth all of the propositions of law that relate to material issues of fact which the evidence tends to support." Riley v. Stone, 900 A.2d 1087, 1092 (R.I. 2006) (quoting Morinville v. Old Colony Co-operative Newport National Bank, 522 A.2d 1218, 1222 (R.I. 1987)). This Court evaluates "jury instructions 'in their entirety to ascertain the manner in which a jury of ordinarily intelligent lay people would have understood them.'" Id. (quoting Parrella v. Bowling, 796 A.2d 1091, 1101 (R.I. 2002)).

NBC's challenge to the jury instructions stems from its chief argument on appeal: that, as a matter of law, Free & Clear could not recover damages beyond August 31, 2005, the date its lease with Davol Square was scheduled to terminate. NBC points to Mahon v. Director of Public Works of Rhode Island, 98 R.I. 426, 204 A.2d 197 (1964), as support for this argument. In Mahon, we reaffirmed our prior holding that, to be enforceable, options to renew a lease agreement must include either a definitive amount for rental payments or, in the alternative, a prescribed method for determining the amount at the time of renewal. Id. at 428-29, 204 A.2d at

198 (citing <u>Vartabedian v. Peerless Wrench Co.</u>, 46 R.I. 472, 129 A. 239 (1925)).  Without these terms, options to renew are void.  <u>See</u> <u>id.</u>

NBC's reliance on <u>Mahon</u> is misplaced, however, because the enforceability of an option to renew a lease agreement is immaterial to the case at bar.  Free & Clear's claim for damages beyond August 31, 2005, does not rest on whether there was an option-to-renew provision in its lease with Davol Square.  In fact, none existed.  Rather, Free & Clear presented evidence at trial that, but for the destruction of the Goff Building and the representations by NBC that it would restore the structure, the pub would have remained in operation either at its original location or at a new site.  Specifically, the jury heard testimony that both the landlord and the tenant would have been amenable to renewing the lease past August 31, 2005, albeit on different terms, and that Cleary had no intention of closing the pub even if his attempts to renew the lease had failed.  For this reason, there is no merit to NBC's argument that Free & Clear could not, as a matter of law, recover damages past August 31, 2005.  The trial justice thus did not err when he declined to instruct the jury as such.

We also reject NBC's contention that the trial justice erred by refusing its request to instruct the jury that, to qualify for damages after August 31, 2005, Free & Clear had the burden to prove that it would have renewed the lease with Davol Square.  Adherence to that request would have resulted, in effect, in an instruction that the jury disregard Cleary's testimony that he would have relocated the pub had the lease not been renewed.  <u>See</u>, <u>e.g.</u>, <u>Miller v. Bessette</u>, 80 R.I. 187, 189, 94 A.2d 253, 255 (1953) (noting that, in instructing the jury, the trial justice may not "call[] to the attention of the jury only [one party's] testimony and nowhere advert[] to the evidence for [the other party]").

NBC also assigns error to the trial justice's instruction that NBC "has acknowledged in this case that its activities caused Free & Clear to lose profits * * * both before and after December 9, 2003, which is when [NBC] damaged Free & Clear's building." This issue was not preserved. Before the trial justice, NBC objected only to the failure of the trial justice to include an end date of August 31, 2005, and not that the instruction amounted to an inaccurate representation of its position. This argument therefore has been waived on appeal. See State v. Gregson, 113 A.3d 393, 398 (R.I. 2015) (indicating that this Court "shall not review issues that were not presented to the trial court in such a posture as to alert the trial justice to the question being raised", quoting Berard v. HCP, Inc., 64 A.3d 1215, 1219 n.2 (R.I. 2013)).

## 2. Jury Speculation

In appealing the denial of its motion for a new trial, NBC next contends that the jury award was based on speculation, arguing that the jury wrongfully applied damages beyond August 31, 2005. Because we have rejected the argument by NBC that Free & Clear could not recover damages beyond that date as a matter of law, this argument also fails. However, we pause to note that the award of $680,277 was well below the seven figures in damages claimed by Free & Clear. Further, without objection from NBC, the jury was asked to enter its verdict on a general verdict form. NBC in effect agreed that the jury should indicate the amount of damages awarded, if any, in a lump sum rather than have them separated and delineated by time period. See, e.g., Union Pacific Railroad Co. v. Barber, 149 S.W.3d 325, 341 (Ark. 2004) ("When special interrogatories concerning liability or damages are not requested, and this court is left in the position of not knowing the basis for the jury's verdict, we will neither question nor theorize about the jury's findings.").

### 3. Wisehart Testimony

NBC also claims that a new trial is warranted because, when issuing his decision on the motion for a new trial, the trial justice failed to review certain aspects of the testimony given by Wisehart, Free & Clear's business appraisal expert. Specifically, NBC asserts that the trial justice did not address its contention that Wisehart's calculations were erroneously based in part on the value of the second pub located in Bristol, which NBC claims was too dissimilar to J.G. Goff's to justify comparison. However, this Court previously has acknowledged that, in passing on a motion for a new trial, "the trial justice need not make an exhaustive analysis of all of the evidence upon which he relies," only that he "refer to the evidence that motivated him to rule as he did." Juchnik v. Betters, 471 A.2d 222, 223 (R.I. 1984).

Here, the trial justice noted the incongruity between the valuation of J.G. Goff's determined by Wisehart and that reached by Porcaro, NBC's business appraisal expert, which he attributed to the "great disparity" in the experts' methods of valuation. He noted that Porcaro did not have the same level of access to Free & Clear accounting records from which Wisehart had benefited. While his analysis did not expound upon every factor that the expert witnesses relied upon in reaching their valuations, the trial justice did reference the most significant points of Wisehart's—and Porcaro's—testimony. See Juchnik, 471 A.2d at 223. He weighed the evidence presented by each business appraisal expert, neither overlooking nor misconceiving their testimony. See Yi Gu, 38 A.3d at 1099. The assignment of error on this ground by NBC thus lacks merit.

### 4. Judicial Estoppel

As the final basis on which NBC appeals the denial of its motion for a new trial, it argues that the trial justice erred in refusing to apply the doctrine of judicial estoppel to portions of

Wisehart's testimony. NBC asserts that the court should have barred testimony that certain expenses were personal to Cleary when, in its sworn tax returns, Free & Clear declared these expenses as business expenses. However, since NBC did not object to this testimony at trial, we decline to consider the issue.[6] See Gregson, 113 A.3d at 398 (issues not presented at trial are not preserved on appeal).

## B. Alternative Motion for Remittitur

NBC next appeals the denial of its alternative motion for a remittitur that was filed in conjunction with its motion for a new trial. A remittitur is defined as "[a]n order awarding a new trial, or a damages amount lower than that awarded by the jury, and requiring the plaintiff to choose between those alternatives." Black's Law Dictionary 1486 (10th ed. 2014). A trial justice may grant a remittitur "when the jury award clearly appears to be excessive or is found to be the result of the jury's passion and prejudice." Lennon v. Dacomed Corp., 901 A.2d 582, 590 (R.I. 2006). Our review of the grant or denial of a remittitur hinges on whether the trial justice "overlook[ed] or misconceive[d] relevant evidence." Id. Here, Wisehart testified that Free & Clear lost $1,218,158 in profits as a result of NBC's actions, and he valued the business at $1,038,000 just before it was forced to cease its operations. Under such circumstances, the jury award of $680,277 hardly seems excessive. We discern no error.

## C. Calculation of Prejudgment Interest

Next, NBC challenges the methodology used by the trial justice in calculating prejudgment interest. General Laws 1956 § 9-21-10(a) governs our analysis of the calculation of prejudgment interest in civil actions. Section 9-21-10(a) provides, in relevant part:

---

[6] Nonetheless, even had this issue properly been before this Court, the doctrine of judicial estoppel does not extend to sworn tax returns. See, e.g., Kaiser v. Bowlen, 455 F.3d 1197, 1204 (10th Cir. 2006); Atlantic Limousine, Inc. v. National Labor Relations Board, 243 F.3d 711, 715 n.2 (3d Cir. 2001); Smith v. Travelers Insurance Co., 438 F.2d 373, 377 (6th Cir. 1971).

> "In any civil action in which a verdict is rendered or a decision made for pecuniary damages, there shall be added by the clerk of the court to the amount of damages interest at the rate of twelve percent (12%) per annum thereon <u>from the date the cause of action accrued</u>, which shall be included in the judgment entered therein." (Emphasis added.)

Since we are confronted with a question of law, we review the calculation of prejudgment interest <u>de novo</u>. <u>See Andrews v. Plouff</u>, 66 A.3d 840, 842 (R.I. 2013).

It is well settled that "[p]rejudgment interest begins to run when the action accrues for purposes of the statute of limitations." <u>Metropolitan Property and Casualty Insurance Co. v. Barry</u>, 892 A.2d 915, 924 n.5 (R.I. 2006). In actions stemming from "injury to property[] resulting from [a] negligent act," the statute of limitations begins to accrue when the injury occurs. <u>Lee v. Morin</u>, 469 A.2d 358, 360 (R.I. 1983); <u>see id.</u> at 359 (homeowner's negligence action alleging property damage as a result of the construction of a municipal aqueduct in an adjacent lot).

NBC contends the prejudgment interest clock should have started running on the date Free & Clear filed suit. Instead, the trial justice declared that prejudgment interest be awarded from December 9, 2003, the date J.G. Goff's was forced to cease its operations. Although Free & Clear offered evidence of injury to the Goff Building and the pub's operations as early as 2002 and NBC conceded interference starting in June 2003, it is undisputed that total destruction of the business occurred on December 9, 2003. We conclude that this date was reasonable and fair as a starting point for the running of prejudgment interest, and we note that the trial justice could have determined that it had accrued even earlier.

### D. Denial of Motion for Partial Judgment as a Matter of Law

Lastly, NBC argues that the trial justice erred by denying its motion for partial judgment as a matter of law. The Court applies <u>de novo</u> review to a trial justice's ruling on a motion for

judgment as a matter of law. O'Connell v. Walmsley, 93 A.3d 60, 65 (R.I. 2014). In so doing, "[t]his Court, like the trial justice, will examine the evidence in the light most favorable to the nonmoving party, without weighing the evidence or evaluating the credibility of witnesses, and draw from the record all reasonable inferences that support the position of the nonmoving party." Id. at 66 (quoting McGarry v. Pielech, 47 A.3d 271, 279 (R.I. 2012)). Judgment as a matter of law is appropriate only upon a determination that the nonmoving party failed to introduce "legally sufficient evidence to allow the trier of fact to arrive at a verdict in his favor." Id. (quoting McGarry, 47 A.3d at 280).

In assigning error to the denial of its motion for partial judgment as a matter of law, NBC again relies on its contention that, as a matter of law, Free & Clear could not recover damages past August 31, 2005, the termination date of its lease agreement with Davol Square. This argument lacks merit. In viewing the evidence in the light most favorable to Free & Clear and applying all reasonable inferences in support of its position, there was sufficient evidence for the jury to find that J.G. Goff's would have remained in business past that date, regardless of whether the lease had been renewed. For this reason, NBC was not entitled to partial judgment as a matter of law.

## Conclusion

Because the defendant's claims of error are unavailing, we affirm the judgment of the Superior Court. The papers in this case may be returned to the Superior Court.

- 17 -


**TITLE OF CASE:** The Free & Clear Company v. The Narragansett Bay Commission et al.

**CASE NO:** No. 2013-336-Appeal.
(PC 06-6371)

**COURT:** Supreme Court

**DATE OPINION FILED:** February 12, 2016

**JUSTICES:** Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**WRITTEN BY:** Associate Justice Maureen McKenna Goldberg

**SOURCE OF APPEAL:** Providence County Superior Court

**JUDGE FROM LOWER COURT**:

Associate Justice Michael A. Silverstein

**ATTORNEYS ON APPEAL:**

For Plaintiff: Michael T. Eskey, Esq.
Stephen A. Izzi, Esq.

For Defendant: Clark W. Yudysky, Esq.
Thomas M. Robinson, Esq.