**Supreme Court**

No. 2015-160-C.A.

(P1/13-725BG)

State                          :

        v.                     :

Quandell Husband.             :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                           :

v.                              :

Quandell Husband.               :

Present:  Suttell, C.J., Goldberg, Robinson, Flaherty, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.**  On July 30, 2012, three persons were brutally murdered in the Arbor Glen housing complex in Providence during an attempted robbery that took a tragic turn.  Michael Martin, the primary target of the robbery, was shot nine times in the kitchen of his apartment.  Damien Colon was shot once in the chest, and Shameeka Barros, who had been sleeping on a couch in the living room, was shot several times as the intruders fled the apartment.

Quandell Husband (defendant or Husband), then sixteen years old, was initially identified as the sole shooter.  Following a waiver hearing in the Family Court, a Family Court justice waived that court's jurisdiction over the juvenile.  Subsequently, new information came to light and the state's theory of the case indicated that Husband was not the shooter.  He was nevertheless indicted, tried, and convicted of three counts of first-degree murder, three counts of discharging a firearm while committing a crime of violence, and one count of conspiracy to commit robbery.  For the reasons set forth in this opinion, we vacate the judgment of conviction.

# Facts and Travel

The state filed a petition of delinquency in Family Court against Husband, charging him with the following offenses: three counts of first-degree murder for the murders of Martin, Barros, and Colon; three counts of using a firearm during a crime of violence; and one count of conspiracy to commit robbery. The state also moved to waive the Family Court's jurisdiction. On September 28, 2012, the Family Court hearing justice found probable cause to believe that Husband had committed the offenses charged; and, on October 19, 2012, the Family Court waived its jurisdiction over the juvenile based on the heinous and premeditated nature of the offenses. Husband was subsequently indicted by a Providence County grand jury on the same charges that were the subject of the Family Court delinquency petition.

A jury trial commenced on July 9, 2014. The state's narrative was primarily established by Donovann Hall.[1] Hall testified that he knew one of the victims, Martin, because Hall bought a "quarter" (seven grams) of marijuana from Martin every day. Martin lived with Barros and her two children. Hall occasionally hung out, smoked, and played video games with Martin and Colon at Martin's apartment. While at Martin's apartment, Hall noticed that Martin had a lot of money and marijuana, and he observed where Martin kept the money and marijuana. In July 2012, Hall formed the idea to rob Martin. Hall brought the idea to Tim DeBritto and, in the presence of Russell Burrell,[2] told DeBritto that he had a "lick" in mind and, according to

---

[1] Hall entered into a cooperation agreement with the state after his arrest on February 23, 2013, for his alleged involvement in the crimes at issue. While in police custody, Hall initially told police that he knew nothing about the murders. He then implicated a person named CT from Connecticut; an Arbor Glen gang called Young Gunners; Tim DeBritto; defendant; and, finally, Russell Burrell as the shooter.

[2] Burrell was arrested on August 9, 2013. Burrell told police that he knew nothing about the crimes; then Burrell told police that it was Hall who shot the victims. The police then mentioned defendant to Burrell. At first, Burrell insisted that defendant was not involved. However, after

Burrell's testimony, that they could get a couple of pounds of marijuana and maybe "a couple thousand" dollars.[3] Two days later, on July 30, 2012, at DeBritto's house, Hall asked DeBritto if he was "down to doing [the robbery]" and DeBritto responded that he was. DeBritto also told Burrell to do the robbery with Hall. Burrell testified that DeBritto was his cousin and a very close friend. The three of them then went outside, Burrell leading the way, with a black, 9mm firearm in his hand. According to Burrell, DeBritto stayed behind. Hall identified the murder weapon as a black, Glock, 9mm handgun, with a red "light under the gun."

According to Hall and Burrell, defendant showed up at DeBritto's house just as they were leaving to rob Martin. Hall testified that he was surprised that Burrell invited defendant to participate because Hall had first met defendant when defendant robbed him for marijuana at gunpoint a couple of months earlier. In an earlier police interview, Burrell said that he told defendant about the robbery and that, at first, defendant did not want to participate but that he eventually "came around." At trial, however, Burrell explained that everything he had said about defendant during the interview was not true, and he testified that defendant was "never" at Martin's apartment. Dakota Snell, Burrell's acquaintance, also testified that she was at DeBritto's house that evening and saw DeBritto, Burrell, and Hall wearing black hoodies, but that she did not see defendant there. According to Hall and Burrell, when they arrived at Martin's apartment, Hall rang the doorbell or knocked on the window, and told Martin that they wanted to buy some "weed." Martin invited them to enter. Inside, Colon was at the kitchen table; and Barros was lying down, asleep, on the living room couch. Burrell suddenly pulled out the gun and said, "You know what time it is" and asked, "where's the shit?" According to

officers told Burrell that defendant had named him as the shooter, Burrell said that defendant was the shooter and that the gun belonged to defendant. Burrell pled guilty to all charges against him on November 25, 2013, and he testified in the instant case under subpoena.

[3] Hall testified that a "lick" means "[t]o rob somebody."

Burrell, Martin pointed and said it was in the drawer. Hall and Burrell testified that, as Hall looked through the drawer, Burrell shot Martin.[4] Hall also testified that, while this was happening, defendant was looking in a bedroom. Burrell then shot Colon in the chest and shot Barros several times. According to Burrell, Hall said, "Gotta kill her", and Burrell gave Hall the gun and he shot her a final time. Hall testified, however, that he ran out of the apartment as soon as the first shot was fired. Hall testified that he stated, "it wasn't supposed to happen like that" and that defendant responded, "Shit happens."

Hall and Burrell both testified that Hall then obtained a ride to the home of Ivy Copeland.[5] Hall testified that he told Copeland that the robbery he had planned "didn't go the right way." Copeland testified that Hall confided the details of the robbery to her, implicating himself and Burrell, and explained that DeBritto was the shooter. Copeland said that Hall never mentioned defendant's participation. Seventeen shell casings were recovered from the crime scene, all of which were 9 millimeter.

Two witnesses also testified that they saw defendant going to 151 General Street, the crime scene location, and leaving that location after shots were fired. Jose Hernandez testified that he knew defendant from playing basketball and from attending programs at the Wanskuck Boys and Girls Club with him. Hernandez testified that, on the night of July 30, 2012, he heard eight or nine gunshots and saw defendant and Burrell put their hoods on and start running across General Street. He also testified that, when the police originally interviewed him, he said he was not sure if he had seen defendant because he was afraid of defendant. Emily Molina also testified that, on that evening, she saw Burrell and defendant walking nearby from outside her

---

[4] Christine Stanley, M.D., the Chief Medical Examiner for Rhode Island, testified that Martin was shot nine times.
[5] According to Burrell, Copeland was Hall's girlfriend.

window moments before she heard gunshots and that they were both wearing black hoodies. She further testified that she looked out her front door and saw Burrell and defendant walking in the opposite direction from which she had seen them walking before the gunfire.

In addition, Lewis Smith, defendant's grandfather, testified that he was in his living room watching wrestling the evening of the murders. Smith claimed that, between 9 p.m. and 11 p.m., defendant was at home and stayed mostly in his bedroom.

Johnathan Anderson testified that, in June 2012, Burrell and defendant went to Anderson's house and that defendant wanted to do pushups. Anderson recalled that defendant asked him to hold a black 9mm handgun he was carrying so he could do the pushups. At a police interview, Burrell corroborated that he and defendant had gone to Anderson's house and identified that particular gun as the murder weapon.

Finally, a fellow inmate of defendant, Ricardo Vasquez, told police that, while in prison, defendant told him that he and Burrell had been "put on" to a robbery for marijuana and money, that they had been given a gun, and that Burrell shot two men and a woman. He also explained that Burrell threw defendant "under the bus" and had "pretty much told on him," even though police had no other evidence against him.

The jury convicted defendant on all seven charges, and the trial justice denied defendant's motion for a new trial. On December 11, 2014, the Superior Court sentenced defendant to three concurrent life sentences for first-degree murder, three concurrent life sentences for discharging a firearm during a crime of violence (to be served consecutively to the murder sentences), and ten years of incarceration for conspiracy (to be served consecutively to the firearm sentences). The defendant timely appealed.

## II

## Waiver of Jurisdiction

## A

## Meaningful Review

On appeal, defendant contends that the Family Court violated his due process rights by waiving jurisdiction without a meaningful review. Specifically, defendant argues that the Family Court erred (1) "by focusing on the nature of the charges rather than the nature of [defendant]'s conduct," (2) by "wrongfully refus[ing] to vacate the waiver even when the Attorney General abandoned its claim that [defendant] was the shooter," and (3) "by failing to consider [defendant]'s background and potential for rehabilitation."

## 1

## Standard of Review

"This Court employs 'a de novo standard [w]hen reviewing an appeal based on an alleged error of law.'" In re Estate of Griggs, 63 A.3d 867, 869 (R.I. 2013) (quoting Warwick Sewer Authority v. Carlone, 45 A.3d 493, 498 (R.I. 2012)).

## 2

## Discussion

On the date of the murders, July 30, 2012, defendant was sixteen years of age, imbuing the Family Court with jurisdiction to adjudicate the allegations against him. See State v. Day, 911 A.2d 1042, 1045-46 (R.I. 2006). On September 14, 2012, the Family Court held a hearing pursuant to G.L. 1956 §§ 14-1-7 and 14-1-7.1 to determine whether the Family Court should relinquish its jurisdiction over defendant. The state presented two witnesses, Providence Police Det. Robert Washburn and juvenile probation officer Bridget Sarlo, and it introduced recorded

statements of defendant and various witnesses into evidence. The defendant presented character and alibi witnesses. On September 28, 2012, the Family Court found that probable cause existed to waive jurisdiction over defendant, stating:

> "[The defendant] was identified by two witnesses who placed him at the scene immediately before and seen running from the scene with * * * Burrell immediately after the shots were heard. * * * Burrell, placed himself and [defendant] at the scene[,] stating it was their plan to commit a robbery with a firearm that * * * Burrell was aware [defendant] was carrying. That the robbery went bad, so-called, and [defendant] shot * * * Martin, * * * Colon, and * * * Barros, and that he and * * * Burrell ran from the apartment immediately after the shootings, that [defendant] gave * * * Burrell the gun to hold and that ammunition matching the murder weapon was found at the home of * * * Burrell pursuant to a search warrant."

On October 19, 2012, the Family Court declined to make a finding concerning defendant's history and treatment and, instead, concluded:

> "As to the premeditated aspect of the offenses. The [c]ourt indicated one of the offenses is conspiracy to commit the crime of robbery and this [c]ourt finds that the charge was premeditated in nature, based upon the full and thorough findings that this [c]ourt made at the Probable Cause aspect of this case.
> "Further, as to the other offenses, the murders of * * * Colon, * * * Martin, * * * Barros and the use of a firearm to commit those murders, this [c]ourt finds based upon the findings of fact this [c]ourt made earlier in the Probable Cause aspect, that these are heinous in nature. Triple homicides, if they're not heinous I don't know what else is.
> "Therefore, the statute does not require this [c]ourt to go into testimony or hearing regarding the past history of offenses or the history of treatment * * *.
> "Accordingly, this [c]ourt finds that the interest of society or the protection of the public necessitates the waiver of jurisdiction of this [c]ourt over * * * [defendant] * * *."

Subsequently, defendant petitioned the Family Court for relief or, in the alternative, to reopen the waiver hearing in light of the state's new theory that Burrell was the shooter. On January 14, 2014, the Family Court denied defendant's petitions, stating: "Jurisdiction of

[defendant] and the offenses lie squarely in Superior Court. There is no Family Court jurisdiction. There is no Family Court case pending. This [c]ourt lacks the power, authority and jurisdiction to entertain * * * [d]efendant's request." The Family Court further explained that the only relief from waiver is in § 14-1-7.1(c), which provides that, "[i]n the event that the child is acquitted of the offense for which the waiver has been sought, the waiver shall be vacated." The Family Court also noted that, had it considered the new evidence presented, the same result would have been reached due to the principles relative to the vicarious liability of coconspirators. Two weeks later, the Family Court similarly denied a second petition by defendant to reopen the waiver hearing.

First, we address defendant's assertion that the Family Court erred by focusing on the nature of the charges against him rather than on his conduct. Section 14-1-7.1 expresses that, before waiving jurisdiction over a juvenile, the Family Court must find probable cause to believe that a juvenile has committed the offense charged and then must examine the facts presented to determine if "the interests of society or the protection of the public necessitate the waiver" by considering either "the child's past history of offenses, [and] history of treatment, or the heinous or premeditated nature of the offense[s.]" See Day, 911 A.2d at 1050.

The defendant argues that, after finding probable cause, the Family Court failed to address his conduct as required by prong two. The defendant contends that, under Day, 911 A.2d at 1053, the term "offense" as employed in § 14-1-7.1 means "the actions of the accused child." Here, the Family Court addressed defendant's conduct in its probable-cause analysis, finding that defendant rang the doorbell, owned the murder weapon, pulled out the gun, and shot the victims. The Family Court based its prong-two determination on the state's theory that defendant had, in fact, committed the homicides, himself. In reaching its conclusion, the Family

Court unsurprisingly characterized triple homicide as "heinous in nature." The defendant relies on Day in support of his argument that the Family Court must determine that his actions, rather than the crime, itself, are heinous. See Day, 911 A.2d at 1053 (explaining that the Family Court is limited to considering the actions of the juvenile and not the crimes charged and interpreting "offense" to mean "actions").

In its probable-cause analysis, the Family Court credited the statement of Burrell that defendant shot Martin and Colon and then shot Barros as "[s]he woke up screaming" on the couch. Clearly, both the offenses and defendant's actions therein, as presented in the evidence before the Family Court at the waiver hearing, were heinous in nature. Moreover, the Family Court correctly noted that the offense of conspiracy to commit robbery is by its very nature premeditated. Accordingly, we are of the opinion that the Family Court's finding that "the interest of society or the protection of the public necessitate[d] the waiver of jurisdiction" over defendant is well supported by the evidence adduced at the waiver hearing.

We next address defendant's assertion that the Family Court erred by refusing to vacate the waiver of Family Court jurisdiction. Section 14-1-7.1(c) provides, in relevant part, that "[a] waiver of jurisdiction over a child * * * shall constitute a waiver of jurisdiction over that child for the offense upon which the motion is based as well as for all pending and subsequent offenses of whatever nature"; only "[i]n the event that the child is acquitted of the offense for which the waiver has been sought" shall the waiver be vacated. In Day, 911 A.2d at 1053, we explained that "once the Family Court orders a waiver of its personal jurisdiction over a child, jurisdiction is vested completely in the adult court." In the case at bar, the Family Court properly refused defendant's repeated attempts to reopen the waiver hearing and correctly ruled that it had no authority to entertain his petition.

Finally, we address defendant's assertion that the Family Court erred by failing to consider his "background and potential for rehabilitation." The defendant argues that the Family Court's consideration of only one of the six factors relevant to a prong-two waiver determination under Rule 12(d) of the Family Court Rules of Juvenile Proceedings was insufficient. By its express language, however, Rule 12(c) sets forth two standards to provide guidance to the court in determining whether to waive jurisdiction, and Rule 12(d) delineates six relevant "[f]actors."[6] We do not read Rule 12, however, as mandating the application of these various factors in a case

---

[6] Rule 12(d) of the Family Court Rules of Juvenile Proceedings articulates:

"Factors in Determining Waiver. For purposes of applying the standards set forth in subdivision (c) of this Rule the following factors are relevant:

"(1) The child's prior delinquent and wayward acts and the nature of the child's conduct therein;

"(2) The nature of the child's alleged conduct in connection with the current charge, to the extent that (a) such allegation of the child's conduct would form a pattern of anti-social conduct that seems beyond the rehabilitative reach of facilities available to the [F]amily [C]ourt, or (b) such alleged conduct indicates that the child is dangerous to the public (dangerous to be measured in light of circumstances surrounding the alleged conduct, such as aggressiveness and the nature of the reasonably foreseeable consequences);

"(3) The child's age, to the extent that a length of time beyond the limits of [F]amily [C]ourt jurisdiction is required for reasonable prospects of the child's rehabilitation;

"(4) The child's attitude, to the extent that it bears on the child's willingness to cooperate with [F]amily [C]ourt rehabilitative efforts;

"(5) The child's family environment (including the degree of care, supervision and support it provides the child), to the extent that family support is essential to the [F]amily [C]ourt's rehabilitative program;

"(6) The child's prior contacts with rehabilitative facilities available to the [F]amily [C]ourt, in the community and in juvenile institutions, in terms of the extent and apparent rehabilitative impact of such contacts."

in which probable cause had been found that the child had single-handedly committed three murders. The Family Court, therefore, did not err in its analysis.

**B**

**<u>Miranda</u> Rights**

The defendant also argues that the Family Court erred by considering evidence that was gathered in violation of his <u>Miranda</u> rights. Specifically, defendant argues that his statements to Det. Washburn were "involuntary because Det. Washburn failed to afford [defendant's mother] an opportunity to invoke [defendant]'s rights on his behalf, despite her presence in the station during the interrogation."

The defendant did not move to suppress these statements during the Family Court waiver hearing.[7] After five days of hearings at the Family Court, during closing argument, defendant's counsel argued that the audio recordings of the interrogation violated defendant's due-process rights because he was "never made aware of [his] rights or acknowledged it on the audio disc." As a result, he argued, the recordings should be "weighed accordingly." Although the Family Court justice said that she "listened to every CD recording in its entirety and took notes on what was heard," her comprehensive bench decision does not present any indication that she relied on defendant's statements to the police in rendering her decision. She thus gave the statements little weight, if any at all. We are of the opinion, therefore, that defendant's argument that the Family Court violated his due-process rights by considering his statements is of no merit.

---

[7] An audio recording of defendant's interrogation was introduced into evidence.

## Evidence of Other Bad Acts or Crimes

The defendant also avers that the Superior Court erred in admitting a substantial amount of evidence concerning other crimes in the community, defendant's past possession of a gun, and the suggestion that he committed past robberies. Specifically, defendant takes issue with the admission of testimony of defendant's grandfather regarding his home confinement, "evidence regarding the shooting of Gary Ellerbe, [defendant]'s alleged possession of a gun at * * * Anderson's house, and * * * Burrell's description of how 'we do a robbery.'"

### A

### Standard of Review

"[I]t is well settled that we review a trial justice's decision admitting or excluding evidence under an abuse of discretion standard." State v. Pona, 66 A.3d 454, 465 (R.I. 2013) (quoting State v. Brown, 42 A.3d 1239, 1242 (R.I. 2012)).

### B

### Discussion

Rule 401 of the Rhode Island Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A determination of relevance "may have an important bearing on the rights of the accused because irrelevant evidence may also be prejudicial and its introduction at trial may constitute reversible error." State v. Burke, 427 A.2d 1302, 1304 (R.I. 1981). In addition, Rule 403 of the Rhode Island Rules of Evidence provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." This Court has repeatedly warned that "the discretion to exclude evidence under Rule 403 must be exercised sparingly." State v. Shelton, 990 A.2d 191, 202 (R.I. 2010) (quoting State v. Hak, 963 A.2d 921, 928 (R.I. 2009)). Accordingly, "[i]t is only evidence that is marginally relevant and enormously prejudicial that must be excluded." Hak, 963 A.2d at 928 (quoting State v. Patel, 949 A.2d 401, 412-13 (R.I. 2008)).

Furthermore, "Rule 404(b) [of the Rhode Island Rules of Evidence] 'prohibits the use of evidence of prior bad acts, wrongs, or crimes to show the defendant's propensity to commit the crime with which he [or she] is currently charged.'" Pona, 66 A.3d at 465 (quoting State v. Dubois, 36 A.3d 191, 199 (R.I. 2012)). Other conduct may be admitted into evidence "if it is interwoven with the current charge in a way that tends to establish guilty knowledge, intent, motive, design, plan, scheme, system, or the like." Id. at 466 (quoting Dubois, 36 A.3d at 199). Finally, Rule 403 provides that even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *."

**1**

**Defendant's Alleged Possession of a Firearm**

First, we address the evidence regarding defendant's alleged possession of a firearm at Anderson's house in June 2012. The defendant argues that Anderson's testimony should not have been admitted because it is not probative of whether defendant was present at the crime scene on July 30, 2012. The defendant further argues that this testimony "suggests that he is * * * bad [and] dangerous * * *." The defendant also argues that corroborative testimony given by Burrell should have been excluded because it implied past bad conduct by defendant.

- 13 -

As previously noted, Anderson testified that approximately a month before the murders, defendant and Burrell came to his house and that defendant asked Anderson to hold a black, 9mm handgun defendant was carrying so that he could do pushups. Burrell corroborated this story at a police interview on March 31, 2014, and identified the 9mm handgun as the murder weapon. At a pretrial hearing on the state's motion in limine, the Superior Court concluded that Anderson's testimony was relevant because it showed that, "a month or so" before the murders, defendant was in possession of the murder weapon. The defendant did not object to Anderson's testimony at trial; therefore, the issue has not been preserved for appellate review. See State v. Saluter, 715 A.2d 1250, 1258 (R.I. 1998) ("this [C]ourt will not consider an issue raised for the first time on appeal that was not properly presented before the trial court." (quoting State v. Gatone, 698 A.2d 230, 242 (R.I. 1997))). Even if the issue had been properly preserved, however, we are satisfied that defendant's argument lacks merit. As this issue may again arise if defendant is retried, we address it briefly.

In State v. Rios, 996 A.2d 635, 639 (R.I. 2010), similar evidence that a defendant on trial for murder frequently carried a gun was determined to be "relevant both to identify him as the murderer and to establish that he had the opportunity to commit the crime." Here, defendant was not alleged to have carried the weapon during the crimes or to have been the actual shooter; rather, the evidence demonstrates that defendant had access to and was carrying the murder weapon approximately one month before the crimes. This evidence was relevant because it suggests a connection between defendant and the crime scene. The defendant was tried on the theory that he was vicariously liable as an aider and abettor of the robbery and murders. His possession of the very same murder weapon a little more than a month before the commission of

the crimes is probative of defendant's participation in the conspiracy and murders. We are of the opinion, therefore, that the trial justice did not abuse his discretion in allowing this evidence.

**2**

**The Ellerbe Shooting**

The state also moved in limine to admit evidence concerning the shooting of Gary Ellerbe by DeBritto with the same 9mm handgun that was used to murder Martin, Colon, and Barros. The state's argument was that the evidence would establish that the murder weapon "was a so-called 'community gun' * * * used variously by * * * DeBritto, * * * Burrell, * * * [and defendant]." The state sought to produce as witnesses Ellerbe, a Providence police officer who had recovered the shell casings from the scene of the Ellerbe shooting, and a ballistics expert who had compared those casings with the casings recovered at the scene of the triple homicide.

The defendant objected, arguing that such evidence was highly prejudicial with "very" limited probative value and that it would be "somewhat confusing to members of the jury." The trial justice ruled that he would permit the evidence, but that he did not intend to retry the Ellerbe shooting. He indicated that the evidence "corroborates the fact that this was a so-called community gun * * * [and] [i]t shows a close connection between Burrell and DeBritto in the months and days leading up to the armed robbery with the same weapon."

At trial, defendant renewed his objection to evidence regarding the Ellerbe shooting, to no avail. Ellerbe testified that, on May 20, 2012, while driving in the vicinity of the Arbor Glen housing complex, he signaled another automobile to stop. That automobile was occupied by DeBritto, Burrell, and two other individuals. Ellerbe said that he got out of his car and approached DeBritto, who was sitting in the front passenger seat, because he "wanted to figure out what was going on between [DeBritto] and his girlfriend and [Ellerbe's] girlfriend, because

- 15 -

they w[ere] fighting." Ellerbe further testified that, as he attempted to do so, DeBritto shot him in the back, told him to run, and kept shooting. He said that he was shot a total of nine times in his back, arm, leg, and down his side. A photograph of Ellerbe, depicting the bullet holes down his side, was introduced as a full exhibit without objection.

Providence Police Det. Douglas Allin testified that, on May 20, 2012, he responded to 85 General Street in the area of Arbor Glen. At that location, he discovered a red Volvo (later determined to have been driven by Ellerbe) with apparent gunshot damage. He also recovered six 9mm shell casings from the street.

Finally, Neil Clapperton of the Rhode Island Crime Laboratory was qualified as an expert in firearms and ballistics examination. He testified that the six shell casings recovered from 85 General Street were all discharged from the same firearm. He also compared these shell casings with the seventeen shell casings recovered from 151 General Street and determined that they all were fired from the same weapon, which he concluded was the firearm sent to the crime lab by the Providence Police in 2013—"[a] Glock model 17, caliber [9mm]."

Although the evidence concerning the shooting of Ellerbe was styled by the state as Rule 404(b) evidence, there was absolutely no testimony linking defendant to the incident in any way. Clearly, he was not the shooter; Ellerbe adamantly identified DeBritto as the person who shot him in the back. Nor was there any evidence suggesting that defendant was present at the scene or even aware of the shooting. At the pretrial hearing, the trial justice stated that the evidence:

> "certainly shows that DeBritto knew and trusted Burrell, to the point that he had no qualms about using that firearm to shoot someone in Burrell's presence; that Burrell was not simply some strange third party, but someone who seemingly enjoyed, or at least easily tolerated DeBritto's use of the firearm.
> "It shows a close connection between Burrell and DeBritto in the months and days leading up to the armed robbery with the same weapon."

- 16 -

Such evidence, however, does not link defendant to this criminal cabal.

We think it significant to note that, when the state filed its motion in limine on February 17, 2014, defendant and DeBritto were co-defendants, the latter subsequently entering a plea. At the time, the state was seeking to admit the evidence of the Ellerbe shooting only with respect to DeBritto.

Based upon our review of the record, we are convinced that the testimony concerning the Ellerbe shooting had slight probative value, if any at all, with respect to defendant. To the extent that it may have shown a relationship between defendant and DeBritto and Burrell, through their shared possession of the 9mm Glock handgun, it was cumulative. See State v. Lynch, 854 A.2d 1022, 1032 (R.I. 2004) ("'[c]umulative evidence' means [evidence] 'tending to prove the same point to which other evidence has been offered.'" (quoting State v. Coleman, 478 N.W.2d 349, 358 (Neb. 1992))).

Moreover, at trial, defendant's relationship with the other coconspirators was not disputed. Burrell testified that he and defendant had been friends for several years; that they saw each other "[a] few times" a week; that Burrell has two children with defendant's sister; that he lived with defendant's mother for a time; that he and defendant went to school together and rode the bus together; and that they were "good friends." Additionally, Burrell testified that he, defendant, and DeBritto shared possession of the handgun. Further, there is no dispute that Burrell was with defendant when Anderson saw defendant carrying the 9mm Glock handgun.

On the other hand, this testimony is highly likely to have had an unduly prejudicial impact on the jury. Ellerbe's testimony is certainly the type that would be likely to rouse the emotions of a jury. He testified that he is a father of six and that he was shot in the back nine times. A photograph showing his injuries was introduced as a full exhibit. Moreover, the

- 17 -

evidence may well have been confusing to the jury. The fact that evidence was elicited at trial that defendant was seen in possession of the same firearm may have led the jurors to believe that he was somehow implicated in the Ellerbe shooting. We also observe that the evidence of a seemingly senseless shooting in the same neighborhood in which the murders would soon take place could not help but cast a pall in the eyes of the jury with respect to the frequency of violence in the community.

We are of the opinion, therefore, that the trial justice abused his discretion by not excluding the evidence of the Ellerbe shooting under a Rule 403 analysis. This is indeed a situation where the evidence was marginally relevant and enormously prejudicial. We are also unable to conclude that the admission of the evidence was harmless beyond a reasonable doubt.[8]

## IV

## Conclusion

For the reasons stated herein, we vacate the judgment of the Superior Court and remand this case for a new trial.

---

[8] Because we vacate defendant's judgment of conviction, we need not address the remaining issues raised by defendant on appeal.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Quandell Husband. |
| **Case Number** | No. 2015-160-C.A. (P1/13-725BG) |
| **Date Opinion Filed** | June 21, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Flaherty, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State: <br><br> Lauren S. Zurier <br> Department of Attorney General <br><br> For Defendant: <br><br> Jeffrey Biolchini, Esq. |