December 15, 2017

| | |
|---|---|
| Sevan (Bjorklund) Cappuccilli | : |
| v. | : |
| David A. Carcieri, M.D., d/b/a Medical Office of David A. Carcieri, M.D. et al. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2015-46-Appeal.
(PC 09-1491)
(Concurrence & Dissent begins
on Page 22)

Sevan (Bjorklund) Cappuccilli         :

v.                                    :

David A. Carcieri, M.D., d/b/a Medical      :
Office of David A. Carcieri, M.D. et al.

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Indeglia, for the Court.**  The plaintiff, Sevan (Bjorklund) Cappuccilli[1] (Ms. Cappuccilli or plaintiff),[2] appeals from a Providence County Superior Court judgment in favor of the defendants, David A. Carcieri, M.D., d/b/a Medical Office of David A. Carcieri, M.D. (Dr. Carcieri or defendant), and Women & Infants Hospital of Rhode Island (Women & Infants).

The plaintiff's claim against defendants arises from an injury that she alleges that she suffered at Women & Infants when she underwent an emergency cesarean section (C-section). After a three-and-a-half-week trial, the jury returned a verdict for defendants.  The plaintiff subsequently moved for a new trial pursuant to Rule 59 of the Superior Court Rules of Civil Procedure.  The trial justice denied the motion on November 25, 2014, concluding that reasonable minds could differ as to whether Dr. Carcieri's conduct fell below the appropriate standard of care.  For the reasons set forth, we affirm the judgment of the Superior Court.

---

[1] Her name on the date of the procedure was Sevan Bjorklund.
[2] Although there were numerous plaintiffs below, Ms. Cappuccilli is the only plaintiff remaining on appeal.

# I

## Facts and Travel

On March 15, 2006, Ms. Cappuccilli was admitted to Women & Infants. Doctor Carcieri, who specializes in obstetrics and gynecology, was also at Women & Infants that day, supervising and teaching Brown University medical residents. At the time she was admitted, Ms. Cappuccilli was full term and in labor with her fifth child. Although he was not Ms. Cappuccilli's primary obstetrician, Dr. Tawfik "Fred" Hawwa cared for her upon her admittance.[3] Ms. Cappuccilli testified that "everything [was] fine, the baby's heart rate[,] everything was going great."

But Ms. Cappuccilli's labor soon took a turn for the worse when her baby began evidencing signs of distress between 12:22 p.m. and 12:29 p.m. At trial, Ms. Cappuccilli recalled "all of a sudden * * * his heart rate was dropping tremendously." As a result of the fetal bradycardia,[4] Dr. Hawwa determined that Ms. Cappuccilli needed an emergency C-section. Doctor Hawwa, unavailable to do the surgery himself, called Dr. Carcieri and asked him to perform the procedure as soon as possible. Doctor Carcieri had had no previous contact with Ms. Cappuccilli, but he nevertheless agreed; and he began the emergency C-section.

### A. The C-Section

Doctor Carcieri delivered "a very healthy baby" without any complications. Soon after the baby's delivery, however, problems arose with Ms. Cappuccilli. Doctor Carcieri testified that Ms. Cappuccilli's uterus had an "odd coloration" of a "purplish appearance" and resembled

---

[3] The plaintiff's primary obstetrician asked Dr. Hawwa to care for his patients that day due to a family emergency.

[4] Fetal bradycardia refers to a sharp drop in the fetal heart rate.

what is referred to as a "Couvelaire uterus."[5] Doctor Carcieri exteriorized[6] the uterus to get a closer look at the uterine incision, encountering no resistance in doing so. Upon further observation, Dr. Carcieri discovered a two-centimeter extension of the uterine incision,[7] which is a horizontal cut in the uterus through which the baby is removed. Doctor Carcieri stitched the incision along with its lengthened extension and returned the uterus.

Nevertheless, the extension continued bleeding. Doctor Hawwa, who had since joined Dr. Carcieri in the operating room, "scrubbed in" to help stop the bleeding. They soon discovered that the bleeding derived from the retroperitoneum,[8] which is where the ovarian vein is located. Doctor Carcieri testified that Dr. Hawwa "proceeded to open the retroperitoneum * * * and clean out all that clot and clean out all that irregular blood" and that it was then that the bleeding intensified. Doctor Carcieri described the bleeding as like "cranberry sauce * * * it just came pouring out." Doctor Hawwa recalled that the blood "clotted and it looked like it had been there for a while. It almost looked like * * * jello." Doctor Hawwa estimated based on the blood's appearance and consistency that it had been there for "a while. Between 45, 30 minutes to an hour."

Doctor Carcieri and Dr. Hawwa testified that they soon discovered the source of the massive bleeding: the ovarian vein had separated into two pieces, referred to in the medical records as an ovarian vein laceration. Doctor Carcieri testified that he and Dr. Hawwa attempted to "tie [the vein] off twice," but "it was very odd. It was almost like tissue paper so when we

---

[5] At trial, Dr. Carcieri clarified that a Couvelaire uterus occurs when there is a "vascular issue" with the uterus, and the uterus usually has blood and purple blotching.

[6] Exteriorizing the uterus is a generally accepted means to get a better view of and ability to work on the uterus. During exteriorization, the uterus is delivered through an incision up through the abdominal wall.

[7] When a uterine incision is extended, the incision has torn longer than the length of the initial opening, which is not an uncommon occurrence.

[8] The retroperitoneum is a thin layer of tissue that protects the vital organs.

tied it, put a tie on it * * * it immediately broke away." Doctor Hawwa testified that "the vein was very, very friable, like, it just crumbled." After Dr. Carcieri and Dr. Hawwa were unable to stop the bleeding, Dr. Richard Moore assisted. Doctor Moore ultimately succeeded in controlling the bleeding, but not before Ms. Cappuccilli lost between 5,000 and 8,000 cubic centimeters of blood—more blood than she had in her body.[9]

## B. C-Section Aftermath

Following her surgery, Ms. Cappuccilli was transferred to the Trauma Intensive Care Unit at Rhode Island Hospital, where she required two more surgeries and remained in a medically-induced coma for a short time. After the procedure, Ms. Cappuccilli was "terribly traumatized by [the] whole thing." When released from the hospital, she experienced severe abdominal pains and swelling in her limbs. She continues to receive treatments for what she testified was diagnosed as lymphedema, a condition that causes swelling in her abdomen, legs, and upper body.[10] She also testified that she began seeing a psychiatrist—Dr. Carmen Monzon—for treatment of depression, anxiety, and nightmares, and started taking medication at Dr. Monzon's direction. Doctor Monzon believed that Ms. Cappuccilli could be suffering from Post-Traumatic Stress Disorder. Ms. Cappuccilli alleges that Women & Infants' risk-management team paid for her prescription for Zoloft[11] in August 2006; the admission of evidence concerning that payment is at issue in this appeal.

Moreover, although her son—Robert—was delivered successfully, he received a two-to-three centimeter wound to his right temple, described in a record as a "laceration from scalpel."

---

[9] As plaintiff lost blood throughout the procedure, the doctors ordered blood transfusions, causing her to lose some of that blood in addition to her own.

[10] Doctor Robert Higgins, one of defendants' expert witnesses, disputed Ms. Cappuccilli's characterization of her diagnosis. Instead, Dr. Higgins testified that Ms. Cappuccilli was not diagnosed with lymphedema, but rather was diagnosed with edema and swelling of the limbs.

[11] Zoloft is an anti-depressant medication.

The admissibility of a photograph of Robert's injury and of a medical record referencing it is also at issue in this appeal.

## C.  Timing and Nature of Lacerated Ovarian Vein

At trial, Ms. Cappuccilli and defendants disputed the condition of her ovarian vein, as well as the timing of its opening.  Doctor Carcieri testified that he believed that the vein was abnormal.  Based on this belief, he testified that the vein ruptured by itself *prior* to the C-section.  Further, he thought that the bleeding from the vein rupture caused the fetal distress that necessitated the emergency C-section.  Doctor Carcieri testified that neither he nor Dr. Hawwa were able to tie the vein off because "it was not a normal vein."  Doctor Carcieri described that the vein felt "like tissue paper when [he] touched it," unlike any other vein he had encountered.

Ms. Cappuccilli disputed Dr. Carcieri's characterization of the vein as abnormal in part because Dr. Carcieri did not notify either Ms. Cappuccilli or Women & Infants about the alleged abnormality, nor did he reference it in his operative note.[12]  Ms. Cappuccilli instead believed that the vein injury occurred *during* the C-section at the hands of Dr. Carcieri.  She pointed to numerous records kept at Women & Infants and Rhode Island Hospital to support that claim.[13]  Doctor Carcieri disputed the reliability of this evidence, testifying that often the person dictating

---

[12] An operative note is created by a surgeon after surgery to describe the operation, including what was seen during the operation.

[13] For example, Dr. Moore explained in his operative report that "[o]n entering the room, [Dr. Carcieri and Dr. Hawwa] indicated to me that a large vein had been lacerated."  Doctor Carcieri's operative report described that "[i]n the area of the hematoma, there was noted to be a laceration in the ovarian vein."  Doctor Hawwa's operative report included that "[d]issection revealed a laceration to the ovarian vein."  Doctor Charles Adams, who performed a subsequent operation on Ms. Cappuccilli, noted in his operative report that "[d]uring this emergent section, the patient had an ovarian vein injury."  A Women & Infants Discharge Summary specified that Ms. Cappuccilli experienced "an ovarian vein tear" during her procedure.  A Rhode Island Hospital Discharge Summary mentioned that "[c]esar[e]an section complications included the ovarian vein being inadvertently torn."  A Rhode Island Hospital coding sheet described an "accidental cut/puncture/perforation/hemorrhage during surgical operation."

these records is the "low man on the totem pole" and is not someone intimately involved in the case.  In addition, Dr. Moore testified that "there are many records made in the medical records that are not fact."  He further described some of the records as "medical record notes that were cut and paste, whether they were done by an intern or medical assistant * * *."

In line with Dr. Carcieri and Dr. Hawwa's testimony, Dr. Moore testified that, based on the injury's location, he did not believe a scalpel lacerated the vein, stating:  "I don't see how you get to that area in the span of doing a C-section."  He believed that the "bleeding had been happening in that retroperitoneum space long before [Dr. Carcieri and Dr. Hawwa] opened it," based on the large collection of blood already in the area.  Doctor Moore also reiterated that "[t]his was a vein that was like tissue paper.  In fact, it was like wet tissue paper * * *.  This was an abnormal vein."  He continued, "the difficulty of ligating that vein off was because it was friable, it was venous complex, it was torturous and it was very abnormal and very difficult to tie off.  I have tied up thousands of infundibulum ligaments, ovarian veins and this is not a normal vein that I have tied off before."  Similarly, Dr. Hawwa testified that, after he had trouble tying the vein, he determined that "this vein is not a normal vein.  I have never seen anything like it before and I have never seen anything like it since then.  It is, it is a tough vein. * * * [W]e were discussing that something must be wrong with this vein, otherwise it would have taken the tie.  A vein should take a tie and hold steady."

### D.  Expert Testimony at Trial

On March 20, 2009, Ms. Cappuccilli filed a medical malpractice action against defendants alleging that they negligently cut or tore her ovarian vein during the C-section. Over the course of a three-and-a-half-week trial, each side presented expert testimony, and a total of fifteen witnesses testified: eleven on behalf of plaintiff and four on behalf of defendants.  The

plaintiff presented Dr. Fred Duboe, an obstetrician gynecologist, who gave his opinion that the injury occurred during the C-section and is not an injury that would occur absent negligence. Doctor Duboe further noted that "the most likely mechanism for the injury was through forceful manipulation of the uterus exteriorizing it or placing it back into the incision upon repair of the uterine incision." Alternatively, Dr. Duboe also maintained that the laceration could have occurred during dissection into the retroperitoneal area and, contrary to Dr. Carcieri's contention, said that such an injury is not anatomically impossible. In addition, plaintiff presented vascular expert Dr. Paul Collier to support her theory that the vein was injured during the C-section. Doctor Collier offered the opinion that the vein did not rupture spontaneously prior to the C-section because, if it had, Ms. Cappuccilli's medical condition would have destabilized more than it had. Doctor Collier also gave the opinion that plaintiff's veins were not abnormal and, instead, the tissue-paper-like quality is "to be expected."

The defendants presented Dr. Michael Arnold, also a specialist in obstetrics and gynecology, who testified to his belief that the bleeding began prior to the procedure and "wasn't something that had happened immediately at the time of the surgery." Rather, basing his opinion on the amount of blood, changes in Ms. Cappuccilli's anesthesia record, and her uterus's Couvelaire appearance, Dr. Arnold believed that Ms. Cappuccilli's ovarian vein spontaneously ruptured around 12:15 p.m. Doctor Arnold also rejected Dr. Duboe's testimony that exteriorizing the uterus can damage the ovarian vein, commenting that it "anatomically and physically * * * doesn't make sense." Finally, defendants presented Dr. Robert Higgins, who opined that Ms. Cappuccilli was not diagnosed with lymphedema, but rather with edema and swelling of the limbs.

### E.  Motion for New Trial

The trial justice charged the jury on two theories of negligence:  (1) a traditional departure from the standard of care; and (2) *res ipsa loquitur*.  On October 29, 2014, the jury returned a verdict for defendants.  The plaintiff moved for a new trial, and the trial justice heard arguments on November 25, 2014.  During the motion hearing, plaintiff claimed the jury "bought" the story that the vein ruptured spontaneously despite overwhelming circumstantial evidence that the injury occurred during the C-section rather than before it.  The plaintiff alleged that the defense's theory that the vein ruptured spontaneously was "manufactured" and stemmed solely from Dr. Carcieri, Dr. Hawwa, and Dr. Moore's testimony, which plaintiff believed was not credible due to contradicting evidence.  She urged the trial justice to "make a finding that those three doctors are not worthy of belief."

In a bench decision, the trial justice denied the motion for new trial.  In his ruling, he explained that his "independent review of the evidence * * * leads to the conclusion that reasonable minds could differ on this critical issue."  The trial justice continued that "one assigned expert was [not] substantially better qualified or more credible and more worthy of belief than the others.  The battle of the experts in this case can best be described as a draw."  He concluded:  "Simply put, the evidence relating to negligence on the part of Dr. Carcieri was equivocal."  The plaintiff timely appealed on December 12, 2014.

## II

### Standard of Review

When "plaintiffs raise multiple issues on appeal, our standard of review differs with respect to each issue."  *Bates-Bridgmon v. Heong's Market, Inc.*, 152 A.3d 1137, 1143 (R.I. 2017).

## A. Denial of a Motion for New Trial

In deciding a motion for new trial, a trial justice independently appraises "'the evidence in the light of his [or her] charge to the jury' and 'may set aside a verdict when [his or her] judgment tells [him or her] that it is wrong because it fails to respond truly to the merits of the controversy and to administer substantial justice and is against the fair preponderance of the evidence.'" *Martin v. Lawrence*, 79 A.3d 1275, 1283 (R.I. 2013) (quoting *Connor v. Schlemmer*, 996 A.2d 98, 114-15 (R.I. 2010)). "If, after conducting this analysis, the trial justice concludes that the evidence is *evenly balanced* or that reasonable minds could differ on the verdict, she [or he] should not disturb the jury's decision." *Id*. (quoting *Accetta v. Provencal*, 962 A.2d 56, 62 (R.I. 2009)) (emphasis added).

"This Court will not upset that determination unless the moving party demonstrates that the trial justice overlooked or misconceived material and relevant evidence or was otherwise clearly wrong." *Bates-Bridgmon*, 152 A.3d at 1144 (quoting *Free & Clear Co. v. Narragansett Bay Commission*, 131 A.3d 1102, 1109 (R.I. 2016)). "[T]he trial justice need not engage in an exhaustive review and analysis of the evidence and testimony presented at trial * * * [but] need only *make reference to such facts* disclosed by the testimony *as have motivated his or her conclusion*." *Hough v. McKiernan*, 101 A.3d 853, 856 (R.I. 2014) (quoting *Bourdon's, Inc. v. Ecin Industries, Inc.*, 704 A.2d 747, 758 (R.I. 1997)).

## B. Evidentiary Rulings

"Generally, the admissibility of evidence 'is within the sound discretion of the trial justice' * * *." *Martin*, 79 A.3d at 1281 (quoting *Fravala v. City of Cranston*, 996 A.2d 696, 703 (R.I. 2010)). "[T]his Court will not interfere with the trial justice[']s decision unless a clear

abuse of that discretion is apparent." *Berman v. Sitrin*, 101 A.3d 1251, 1259 (R.I. 2014) (quoting *Morel v. Napolitano*, 64 A.3d 1176, 1179 (R.I. 2013)).

**III**

**Discussion**

On appeal, plaintiff raises three issues: (1) that the trial justice in the decision on a motion for new trial overlooked or misconceived material evidence by failing to comment on the credibility of defendants' theory regarding the vein laceration's cause and timing; (2) that the trial justice abused his discretion in excluding a photograph and medical record evidencing a "laceration" on plaintiff's newborn son; and (3) that it was an abuse of discretion to exclude a document referencing Women & Infants' risk-management team's involvement in plaintiff's medical case. We discuss each claim of error in turn.

**A. Credibility of Testimony as to the "Vein Laceration"**

The plaintiff's first argument calls our attention to the trial justice's determination that reasonable minds could differ as to whether Dr. Carcieri complied with the standard of care. Specifically, plaintiff alleges that the trial justice erred in failing to "resolve the credibility gap between what the contemporaneous medical records document and what the defendants told the jury eight years later." On appeal, we are careful not to stray from the applicable standard. "'If the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did * * *,' the motion for * * * new trial should be denied." *State v. Kizekai*, 19 A.3d 583, 590 (R.I. 2011) (quoting *State v. Pineda*, 13 A.3d 623, 641 (R.I. 2011)). Based on the extent of evidence presented in this case, it is certainly conceivable that the trial justice could have articulated the basis for his decision that reasonable minds could differ as to Dr. Carcieri's negligence more expansively. However, in light of our

precedent that a trial justice "need not engage in an exhaustive review," we are satisfied that his concise overview of the evidence that motivated his decision was sufficient.[14] *Hough*, 101 A.3d at 856 (quoting *Bourdon's*, 704 A.2d at 758); *see also Bitgood v. Greene*, 108 A.3d 1023, 1029 (R.I. 2015) (holding that, after the trial justice cited the standard of review, summarized the facts, and determined that "[t]he credible evidence presented was so evenly balanced and such that different minds can naturally and fairly come to different conclusions," the Court was "well satisfied that the trial justice engaged in the appropriate analysis"); *Kwarciak v. Star Market*, 506 A.2d 545, 547 (R.I. 1986) ("Such a review and advertence to the salient elements of the case should be sufficient to enable the reviewing court to determine whether the trial justice was warranted in reaching such conclusions.").

The crux of plaintiff's argument centers on the cause and the timing of the "laceration" of the ovarian vein. Each side offered experts to refute the opinions of the other; and, as the trial justice noted, "one assigned expert was [not] substantially better qualified or more credible and more worthy of belief than the others." Apart from expert testimony, plaintiff also presented evidence to show that defendants did not document plaintiff's abnormal vein in her medical records, nor did defendants inform plaintiff that she had an abnormal vein. The plaintiff contended that defendants "manufactured" their theory only after litigation commenced, arguing that defendants' "theory of the case is improbable, unbelievable, and made up."

---

[14] We also remark that, prior to the hearing on the motion for new trial, the trial justice had "received memoranda from both sides * * * and * * * reviewed them both," noting further that he "always like[s] to afford the attorneys an opportunity to argue in addition to filing the memos if they wish to further elaborate or embellish on the papers they have provided with me previously." After hearing argument, but before explaining the basis for his ruling, he told the parties that "the [c]ourt's analysis will primarily focus on witnesses who testified regarding the obstetric gynecological standard of care." He then proceeded to synopsize the evidence he considered in making his ruling, including the expert testimony, before revealing his ultimate conclusion denying the motion after "carefully review[ing]" and "assess[ing]" the evidence.

Yet, for each piece of evidence that plaintiff proffered, defendants tendered evidence to refute it. For example, plaintiff argues on appeal that the trial justice failed to reconcile the "wealth of documentary evidence from plaintiff's medical records" with his determination that reasonable minds could differ as to Dr. Carcieri's alleged negligence. However, although the trial justice remarked that plaintiff's medical records "describe an injury to the plaintiff's ovarian vein as a 'lacerated ovarian vein' or as an 'inadvertently torn ovarian vein,'" he also highlighted Dr. Moore's testimony that "'lacerated' in medical terminology could also mean blunt[] trauma, or physiologic changes causing the vein to bleed rather than refer to a cut made by a sharp instrument." In doing so, he followed the standard required of a trial justice when ruling on a motion for a new trial: "In setting forth the rationale for a decision, 'the trial justice need not refer to all the evidence supporting the decision, rather he need only cite evidence sufficient to allow this [C]ourt to discern whether the justice has applied the appropriate standards.'" *State v. Swiridowsky*, 126 A.3d 436, 442 (R.I. 2015) (quoting *Kizekai*, 19 A.3d at 589); *see also Free & Clear Co.*, 131 A.3d at 1111 ("[T]his Court previously has acknowledged that, in passing on a motion for * * * new trial, 'the trial justice need not make an exhaustive analysis of all of the evidence upon which he relies,' only that he 'refer to the evidence that motivated him to rule as he did.'" (quoting *Juchnik v. Betters*, 471 A.2d 222, 223 (R.I. 1984))); *Morinville v. Morinville*, 116 R.I. 507, 511-12, 359 A.2d 48, 51 (1976) ("the trial justice need not make an exhaustive analysis of the evidence or state all his conclusions as to the weight of the evidence or the witnesses' credibility, but he should at least refer sufficiently to what motivates him to rule as he does * * *"). The trial justice undoubtedly met the benchmark of referring "sufficiently" to what motivated his ruling. *See Morinville*, 116 R.I. at 512, 359 A.2d at 51.

Still, plaintiff takes issue with the trial justice's alleged failure to comment on and offer his independent appraisal of the timing of her injury. The plaintiff fails to recognize, though, that defendants presented expert testimony to support their theory that the vein ruptured prior to surgery, rather than during surgery as plaintiff's experts asserted; and, as the trial justice aptly put it, "[t]he battle of the experts in this case can best be described as a draw." Contrary to plaintiff's argument, we believe that the trial justice addressed the conflicting evidence and resolved it by determining that the evidence, when compared, ends in "a draw." He found that each expert was well-qualified, similarly credible, and "gave plausible medically supported opinions and views of what they believed occurred during the plaintiff's surgery." He determined that "[s]imply put, the evidence relating to negligence on the part of Dr. Carcieri was *equivocal*." (Emphasis added.) In so ruling, it follows that the evidence was "evenly balanced" and thus it would be inappropriate for the trial justice to disturb the jury's verdict. *Martin*, 79 A.3d at 1283 ("'If, after conducting this analysis, the trial justice concludes that the evidence is *evenly balanced* or that reasonable minds could differ on the verdict, she [or he] should not disturb the jury's decision.'" (quoting *Accetta*, 962 A.2d at 62)) (emphasis added); *see also Free & Clear Co.*, 131 A.3d at 1111 ("[The trial justice] weighed the evidence presented by each * * * expert, neither overlooking nor misconceiving their testimony.").

In our opinion, the trial justice did not "overlook[] * * * significant credibility issues;" rather, he found each side equally credible, hence "mak[ing] an independent appraisal of the evidence, passing upon the weight of the evidence[,] and assessing the credibility of the witnesses." *Reccko v. Criss Cadillac Co.*, 610 A.2d 542, 545 (R.I. 1992). Because there is nothing to indicate that he either overlooked or misconceived evidence or that he was clearly wrong, we agree with the trial justice that reasonable minds could differ as to whether Dr.

Carcieri's actions fell short of the standard of care. *See Bates-Bridgmon*, 152 A.3d at 1144 (citing *Free & Clear Co.*, 131 A.3d at 1109).

## B. Photograph and Medical Record of Ms. Cappuccilli's Son

Next, plaintiff argues that the trial justice erred by relying on Rule 403 of the Rhode Island Rules of Evidence to exclude the photograph depicting a wound to her newborn son's face, as well as a medical record referencing that wound. We discuss each argument in turn.

### 1. Photograph of Ms. Cappuccilli's Son

The trial justice heard arguments regarding the photograph during defendants' motion *in limine*. The plaintiff argued that the photograph should be admitted because it related to the central issue in the case—"whether or not Dr. Carcieri was a skilled[,] prudent practitioner that day." The plaintiff admitted that her experts did not consider the baby's laceration in forming their opinion. The trial justice questioned the jury's need to see "a photograph of a beautiful little baby with a large scar on the side of his head[.] * * * They see a cut on this beautiful little baby's face or side of his head, that is pretty powerful." The trial justice ultimately concluded "[t]he picture is out."[15]

A "limit on the general rule favoring the admission of relevant evidence provides that relevant evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *.'" *Accetta*, 962 A.2d at 60 (quoting Rule 403 of the Rhode Island Rules of Evidence). This determination is "confided to the sound discretion of the trial justice." *Id*. Still, "[t]his Court has repeatedly warned that 'the discretion to exclude evidence under Rule 403 must be exercised sparingly.'" *State v. Husband*, 162 A.3d 646, 655 (R.I. 2017) (quoting *State v. Shelton*, 990 A.2d 191, 202 (R.I. 2010)). "Accordingly, '[i]t is only evidence

---

[15] Although counsel did not press the issue at oral argument, we address it in any case.

that is marginally relevant and enormously prejudicial that must be excluded.'" *Id.* (quoting *State v. Hak*, 963 A.2d 921, 928 (R.I. 2009)).

The plaintiff gives two grounds for her argument that the photograph is highly probative and should survive a Rule 403 analysis: (1) the photograph would have assisted the jury in resolving the meaning of "laceration"; and (2) the photograph is relevant to Dr. Carcieri's credibility and overall skill level during the course of her C-section. Despite plaintiff's attempts to persuade him otherwise, the trial justice held that the probative value of the photograph was substantially outweighed by its unfair prejudice. We believe he did not abuse his discretion in so ruling.

### i. Meaning of "Laceration" at Women & Infants

First, plaintiff argues that the photograph is probative of Women & Infants' definition of "laceration" at the time of her C-section because a medical record described her son's injury as a "laceration." The plaintiff urges this Court, then, to make the inference that because "laceration" in this photograph referred to a wound caused by a surgical instrument, when "laceration" is referenced in other records it should be similarly interpreted.

We note that plaintiff did not raise the argument that the photograph would help resolve the meaning of "laceration" at either the motion *in limine* hearing or at trial. As we have repeatedly reiterated, "the 'raise-or-waive' rule precludes a litigant from arguing an issue on appeal that has not been articulated at trial." *Thornley v. Community College of Rhode Island*, 107 A.3d 296, 302 (R.I. 2014) (quoting *State v. Ford*, 56 A.3d 463, 470 (R.I. 2012)).

Despite plaintiff's failure to preserve this argument, we nonetheless pause to consider its merit. At trial, the defense presented witnesses who attested that "laceration" has a distinct medical meaning different from a layperson's interpretation of the term. Doctor Moore testified:

"When we talk about laceration in medical terms, not only in lay person terms * * * we think of laceration like a cut from a knife or something sharp. Laceration can come from blunt trauma, it can come from physiologic changes. * * * Even though there wasn't something sharp that cut it, it was laceration. If you get hit with a baseball bat, a cut in your skin is a laceration. So laceration doesn't necessarily mean medically that it is done by a sharp instrument."

The photograph would not be meaningfully probative of Women & Infants' interpretation of "laceration," but rather would only be minimally probative of one of many possible interpretations. In other words, Dr. Moore's testimony illustrates that "laceration" has many meanings in the medical context, so the mere fact that the photograph depicts what is described as a "laceration" is not dispositive of Women & Infants' interpretation of the term. Instead, it only reflects one possible use. In weighing that minimal probative value against the significant prejudice that the trial justice recognized, we cannot agree that the trial justice abused his considerable discretion in excluding the evidence. We will not disturb the trial justice's ruling.

### ii. Doctor Carcieri's Skill During the C-Section

Alternatively, plaintiff alleges that the photograph is probative of the skill Dr. Carcieri used during the procedure. On the contrary, we believe that the trial justice did not abuse his discretion in determining that the photograph has little probative value because it is not relevant to the issue in the case, which is whether Dr. Carcieri failed to adhere to the standard of care he owed to *plaintiff* during her emergency C-section. As defendants highlight, the issues with plaintiff's care began after Dr. Carcieri successfully delivered her son. Hence, any alleged injury to plaintiff's son at the time of his birth is not correlated to this action.

The plaintiff's argument that the photograph is evidence of Dr. Carcieri's skill is too attenuated to survive where her civil action asserts solely a breach of the standard of care owed to her, not to her son. With only that limited probative value, the substantial prejudice of the

- 16 -

photograph easily outweighs its relevance.  Accordingly, the trial justice did not abuse his discretion in excluding the evidence because "[t]his is indeed a situation where the evidence was marginally relevant and enormously prejudicial."  *Husband*, 162 A.3d at 658.

### 2.  Medical Record of Ms. Cappuccilli's Son

During defendants' motion *in limine*, the trial justice also considered the proposed introduction of Ms. Cappuccilli's son's medical record referencing his injury.  During that motion, defendants expressed concern that plaintiff would "improperly draw conclusions" from the record without expert testimony, noting that "[plaintiff] already told this [c]ourt that [she] intend[s] to try to raise the specter to say because the baby has got a cut, * * * there might have been a cut somewhere else, when not one of [plaintiff's] experts said that there was a cut." While the trial justice explicitly excluded the photograph, he reserved ruling on the record until he saw "in more detail how some of these doctors testify" and "how things develop."[16]

At trial, plaintiff sought to introduce the record again, but defendants objected on the basis of relevance.  The defendants reiterated that the baby had no claim in the case and plaintiff did not have an expert to connect the baby's injury to that of plaintiff.  The defendants asserted that the sole purpose was to inflame the jury.  The plaintiff, on the other hand, argued that it went to credibility because Dr. Carcieri did not mention either a lacerated vein or a laceration to the baby's face in his operative note.  As plaintiff put it, "[i]t is not as if * * * we have a completely unrelated injury in this case.  We have a laceration and now we have another."  After noting that it was a "simple [Rule] 403" analysis, the trial justice concluded as follows:

> "I don't know enough about the issue * * * if the mere fact is he is
> a sloppy doctor who cut the baby's head along with all of the other

---

[16] We note also that the trial justice reminded counsel, "just alert me ahead of time and I will make a definitive ruling at that time[,] but I feel better if some of the record is developed prior to that time."

things that he did to * * * [p]laintiff, I don't think that is really, in my opinion, an apples and oranges argument simply because it is so prejudicial, and it is really designed to evoke sympathy and dislike of the doctor as opposed to them objecting or assessing what he did to the mother, if anything. So, I'm not ruling out that there could be some facts and circumstances demonstrated that make whatever happened to that child * * * probative * * *. But I'm not a mind-reader. * * * I just can't make the call right now."

Later in the trial, plaintiff argued that "since [Dr. Carcieri] has now said that * * * he doesn't have any knowledge of any other inadvertent injury in this C-section, I have the right to confront him with a record that establishes that there was." The trial justice responded that he was "still reluctant with where the testimony is at letting [plaintiff] pursue the laceration to baby [*sic*] head." He indicated that he "want[s] to know what the doctor performing a surgery typically does or is required to do in terms [*sic*] documenting and records [*sic*] whatever happens whatever he sees, whatever occurs during that surgery I would like more." The plaintiff continued to question Dr. Carcieri, but soon concluded the questioning without another reference to the baby's record.

We glean no further attempt by plaintiff to introduce the medical record she now argues the trial judge erred by excluding. Each time the trial justice considered plaintiff's introduction of the record, he expressed that her purported use was inappropriate. Yet, he never gave a definitive ruling, instead reserving his ruling pending additional information, but plaintiff failed to preserve the issue and appeared to abandon the argument. Where the applicable standard confines us to consider only the trial justice's decision, absent a definitive ruling it is improper for this Court to consider plaintiff's argument. *See Berman*, 101 A.3d at 1259 (citing *Morel*, 64 A.3d at 1179). Because "[t]his Court will not reverse a decision of a trial justice admitting or excluding evidence in the absence of an abuse of discretion[,]" it follows that, where the trial

justice neither admitted nor excluded the evidence, we will not address the issue. *Dawkins v. Siwicki*, 22 A.3d 1142, 1154 (R.I. 2011).

## C. Record Referencing Risk Management

Last, plaintiff argues that the trial justice erred in excluding a record showing that Women & Infants' risk-management department paid for her prescription for Zoloft following the procedure. The medical record memorializes a phone message left for Dr. Monzon regarding risk-management's payment of plaintiff's Zoloft prescription. The trial justice excluded the record, ruling it inadmissible pursuant to G.L. 1956 § 9-19-35, which excludes evidence of a medical provider's failure to bill in medical malpractice cases.[17] Alternatively, he excluded the record based on its unfairly prejudicial nature in accordance with Rule 403. We agree with the trial justice in each respect.

## 1. Section 9-19-35

The plaintiff first argues that the trial justice erred in excluding the document because § 9-19-35 excludes only evidence introduced to prove liability, not to prove bias or prejudice, as allowed by other provisions.[18] In accordance with the statute, plaintiff persists that she sought to introduce this evidence not to prove liability, but instead to prove defendants' bias and prejudice. The plaintiff contends she sought "to show not only that [the doctors] may have been influenced by [Women & Infants'] risk-management department early on in the case but that risk

---

[17] The full statute, titled "Failure to bill inadmissible in medical malpractice cases," reads: "The failure of a health care provider to bill a patient for services rendered shall not be construed as an admission of liability and shall not be admissible in evidence as to liability in any hearing or trial of an action of tort or breach of contract for malpractice, error, or mistake against a health care provider." General Laws 1956 § 9-19-35(b).

[18] The plaintiff specifically addresses Rule 411 of the Rhode Island Rules of Evidence, which prohibits evidence of liability insurance to prove liability, but permits such evidence to prove "agency, ownership, or control, *bias or prejudice of a witness*, or when the court determines that in the interests of justice evidence of insurance or lack of insurance should be permitted." *Id.* (emphasis added).

management itself concluded that the plaintiff had post-incident depression." She continues "it is fair for [the jury] to know that at the time that the treatment was taking place, [the doctors] were or may have been influenced by [r]isk [m]anagement."

The trial justice, however, disagreed, explaining that "'risk management' * * * gives rise to [an] inference of some acceptance of responsibility by * * * defendant[s]." He further expressed that it could be "construed by the jury as an admission of liability in the sense that early on after this woman's treatment at the hospital, they are paying for medication to treat a symptom that she is now going to argue * * * was proximately caused by what the doctor in the hospital did to her." In light of the trial justice's discretion, we do not disturb his ruling that the jury would likely view the document as an admission of liability. His stated reason for excluding the evidence—that the jury might misconstrue it as an admission—certainly indicates that there are "some grounds to support the decision." *Berman*, 101 A.3d at 1263 (R.I. 2014) (quoting *Dalo v. Thalmann*, 878 A.2d 194, 200 (R.I. 2005)). As such, "under the abuse of discretion lens," we find no error in his ruling. *Id.* at 1264.

### 2.  Rule 403

Even if the evidence were admissible pursuant to the aforementioned statute, it is inadmissible under Rule 403. As noted, "Rule 403 * * * provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant." *State v. Fry*, 130 A.3d 812, 830 (R.I. 2016). The trial justice believed that the evidence was unduly prejudicial because it mimicked inadmissible liability insurance evidence prohibited under Rule 411 of the Rhode Island Rules of Evidence.

The plaintiff argues that the evidence is probative for three reasons: (1) to show the defendants' bias; (2) to rebut the defendants' dispute about the extent of her psychological

injuries; and (3) to support her claim that the vein did not spontaneously rupture and, instead, the defendants met with risk management because they realized their actions could expose them to litigation. Although plentiful, the plaintiff's proffered reasons are of little assistance when weighed against the unfair prejudice the trial justice feared. "It is well settled that the purpose of Rule 411 is 'to discourage inquiry into a defendant's indemnity in a manner calculated to influence the jury. It is applicable only where, in all the circumstances, it cannot be reasonably concluded that the jury could ignore or disregard such references to an insurer.'" *Oden v. Schwartz*, 71 A.3d 438, 454-55 (R.I. 2013) (quoting *Cochran v. Dube*, 114 R.I. 149, 152, 330 A.2d 76, 78 (1975)). The spirit of inadmissible liability insurance and the risk-management evidence here is the same: Each triggers a connotation of remedial relief and admission of liability. That connotation invites unfair prejudice, which is what concerned the trial justice: that there could be "an extreme[], if not, incurable prejudice that would flow from that document" that would "really taint the juror's deliberations." The plaintiff's argument that "risk management is a very sophisticated department within the hospital that most people don't understand * * * a lay jury is not going to understand that risk management means insurance" both overstates the department's complexity and underestimates the jury's intelligence. As we have previously held, "[i]t is within the trial justice's discretion to determine the effect of evidence submitted." *Miller v. Rhode Island Hospital*, 625 A.2d 778, 780 (R.I. 1993) (citing *State v. Grundy*, 582 A.2d 1166, 1172 (R.I. 1990)). The trial justice's concern that the evidence too closely resembles liability insurance was sound, and we decipher no error in his ruling that "risk management is tantamount to saying insurance to a jury even if it is not tantamount to insurance." *See Berman*, 101 A.3d at 1263 ("we will not conclude that a trial justice abused his

or her discretion as long as *some grounds* to support the decision appear in the record" (quoting *Dalo*, 878 A.2d at 200) (emphasis added)).

IV

**Conclusion**

For the reasons stated herein, we affirm the judgment of the Superior Court. The record shall be returned to that tribunal.

**Justice Goldberg, concurring and dissenting.** I concur in the majority's opinion that affirms the trial justice's evidentiary rulings in this case. However, we part company with respect to the holding that affirms the denial of the plaintiff's motion for a new trial. It is my opinion that the trial justice overlooked and misconceived the critical issue raised by the plaintiff and failed to pass upon the credibility of the witnesses. Despite presiding over a sixteen-day jury trial, after summarizing the testimony of the witnesses, the decision denying the motion for a new trial consisted of two paragraphs:

> "This Court has carefully reviewed the material testimony in evidence offered on the critical issue of whether Sevan Cappuccilli's right ovarian vein was injured by a surgical instrument or by force or [exteriorization] of her uterus during her [cesarean] section surgery. The Court assesses in weighing the testimony and the medical records of the Women & Infants Hospital, Rhode Island Hospital, and the attending physician, Dr. Carcieri, and his colleagues who assisted him, Dr. Hawwa and Dr. Moore. The Court has weighed the testimony of the expert physicians offered to establish the standard of care applicable to plaintiff's surgical procedures, Doctors Duboe and Collier for the plaintiff and Dr. Arnold for the defendant.
>
> This Court's independent review of the evidence relating to the question of whether the standard of care was met by Dr. Carcieri leads to the conclusion that reasonable minds could differ

- 22 -

on this critical issue. All of the physicians who testified, both attending and experts, appear to be relatively well qualified and well prepared to put their opinions forward. This Court does not find that one assigned expert was substantially better qualified or more credible and more worthy of belief than the others. The battle of the experts in this case can best be described as a draw. Plaintiff's and defendant's experts gave plausible medically supported opinions and views of what they believed occurred during the plaintiff's surgery. Simply put, the evidence relating to negligence on the part of Dr. Carcieri was equivocal. Therefore, this Court cannot say this verdict is wrong or is against the fair preponderance of the evidence or fails to administer substantial justice. The plaintiff's [motion] for a new trial is denied."

It is undisputed that this Court reviews a trial justice's denial of a motion for a new trial under a deferential standard, and will disturb the trial justice's decision only if it is evident from the record that the trial justice overlooked or misconceived material evidence or otherwise erred by failing to exercise his or her independent judgment in evaluating the verdict. *See State v. Luanglath*, 749 A.2d 1, 4 (R.I. 2000); *see also Hefner v. Distel*, 813 A.2d 66, 70 (R.I. 2003) (trial justice must analyze the evidence and pass upon the credibility of the witnesses; his questions to counsel did not serve to establish the basis of trial justice's decision granting a new trial or additur). A deferential standard of appellate review is not without limitation. The trial justice is required to review the evidence in light of his or her charge to the jury; and must then independently analyze the evidence and its weight and pass upon the credibility of the witnesses. *Luanglath, 749 A.2d at 4; see also Hefner*, 813 A.2d at 69 ("If a trial justice properly reviews the evidence—commenting on its weight *and on the credibility of the witnesses* and uses independent judgment in doing so, his or her decision will not be overturned * * *.") (emphasis added); *Kurczy v. St. Joseph Veterans Association, Inc.*, 713 A.2d 766, 770 (R.I. 1998). This Court will affirm the denial of a new trial motion "after we have determined 'that the trial justice has complied with the requisite procedure and articulated an adequate rationale'" for his or her

decision. *State v. Golembewski*, 808 A.2d 622, 625 (R.I. 2002) (quoting *State v. Otero*, 788 A.2d 469, 472 (R.I. 2002)). "In deciding whether the justice's rationale for his decision was adequate, we examine the trial justice's discussion of some of the evidence presented at trial." *Id.*

The credibility of a witness "refers to whether a witness is being truthful or untruthful." *Jenkins v. Commonwealth*, 308 S.W.3d 704, 711 (Ky. 2010). Credibility is "that quality in a witness which renders his [or her] evidence worthy of belief." *Luanglath*, 749 A.2d at 5 (quoting Black's Law Dictionary 366 (6th ed. 1990)). The trial justice's task in passing on a witness's credibility can include a finding that, in light of other evidence presented at trial, the witness's testimony is or is not worthy of belief, *State v. Dame*, 560 A.2d 330, 333 (R.I. 1989), or, that the testimony was inherently improbable, *Beauchemin v. Sweeten*, 471 A.2d 624, 627 (R.I. 1984), or unworthy of belief because it was contradicted by other direct or circumstantial evidence, *Evangelista v. Antonio De Cubellis*, *Inc.*, 79 R.I. 142, 149, 85 A.2d 69, 72 (1951). Additionally in some cases, the reliability of a witness may also be a factor to consider in passing on his or her credibility. *Luanglath*, 749 A.2d at 5. In the case at bar, the trial justice simply did not address the arguments presented by plaintiff, nor did he pass on the credibility of the witnesses. This case should be remanded for a rehearing on plaintiff's motion for a new trial.

The majority opinion acknowledges that, in light of the extensive evidence in this case, the trial justice "could have articulated the basis for his decision that reasonable minds could differ as to Dr. Carcieri's negligence more expansively." Nonetheless, citing *Hough v. McKiernan*, 101 A.3d 853 (R.I. 2014), the majority concludes that, because the trial justice need not engage in an exhaustive review of the evidence in deciding a motion for a new trial, "we are

satisfied that his concise overview of the evidence that motivated his decision was sufficient."[1] *Id.* at 856. I respectfully disagree. "When a trial justice denies a new trial motion, we require the justice to 'set out in some reasonable manner the material factual evidence * * *, direct or circumstantial, upon which his or her ruling is based.'" *Golembewski*, 808 A.2d at 626 (quoting *State v. Vorgvongsa*, 670 A.2d 1250, 1252 (R.I. 1996)).

To be sure, this Court has recognized that a trial justice "need not engage in an exhaustive review and analysis of the *evidence* and testimony presented at trial" and "need only make *reference to such facts* disclosed by the testimony *as have motivated his or her conclusion.*" *Hough*, 101 A.3d at 856. However, we have never excused a failure to reference *any* facts that motivated the ruling or affirmed a decision that overlooked the important duty of the "super juror" to make an independent appraisal of the evidence in light of the charge to the jury, or that failed to assess the credibility of the witnesses. *See Hefner*, 813 A.2d at 70-71 (this Court vacated a decision granting a motion for a new trial based on the trial justice's failure to analyze the evidence or pass upon the credibility of the witnesses). In *Hefner*, this Court rejected the trial court's decision and, in doing so, noted that the trial justice's "questions to counsel [were] the primary source for inferring the basis of his decision[.]" *Id*. It is noteworthy that in

---

[1] The majority opinion also references the fact that before the hearing, the trial justice had received and reviewed the parties' memoranda and declared that he was affording counsel a further opportunity to "elaborate or embellish on the papers" previously filed. The plaintiff's memorandum however, was laser-focused on the medical records presented to the jury which, plaintiff contended, established that the injury occurred during and not before the cesarean-section surgery. The plaintiff pointed to eleven references to this injury in the hospital medical records as well as numerous post-surgery treatment notes compiled by Dr. Moore spanning three years—evidence that, if believed by the jury, could have led to a different result. None of this evidence was even mentioned in the decision.

*Golembewski*, 808 A.2d at 626, this Court remanded the case to the Superior Court for a rehearing on the defendant's motion for a new trial.

In my opinion, the trial justice provided this Court with an appropriate review of the *testimony* in this case; it is his decision that is lacking because he overlooked the medical records evidence upon which the new-trial motion rested; nor did he pass upon the credibility of the witnesses particularly as juxtaposed against the medical records. This Court has never declared that a trial justice, in deciding a motion for a new trial, is free to overlook the credibility of the witnesses or to fail to independently analyze the evidence.

Because the trial justice misconceived the central issues before him, failed to point to the evidence upon which his decision rested, and overlooked the credibility of the witnesses, this Court should remand this case for a rehearing. In *Hefner*, 813 A.2d at 70, we vacated the grant of a new trial because "the trial justice did not analyze the evidence or pass upon the credibility of the witnesses."[2] Here, the trial justice limited his analysis to "the testimony of the expert physicians offered to establish the standard of care applicable to plaintiff's surgical procedures." In this case, the standard of care in a medical negligence trial was not the basis of plaintiff's new-trial motion. The critical issue before the trial justice was factual and temporal. Did the injury occur before the baby was born, as defendants contended or was that defense manufactured after this lawsuit was filed, as plaintiff argued; and was the evidence sufficient to establish that the injury occurred during the surgery.

---

[2] In *Hefner v. Distel*, 813 A.2d 66, 70 (R.I. 2003), this Court applied the appellate rule based on the trial justice's failure to make a specific appraisal of the evidence. Our decision in *Hefner* however, did not require the Court to pass upon the credibility of the witnesses. *Id.*; *see also Lyons v. Rhode Island Public Employees Council 94*, 516 A.2d 1339, 1344 (R.I. 1986) ("as a general rule credibility cannot be assessed by one who has neither seen nor heard the witnesses."); *Ruggieri v. Beauregard*, 110 R.I. 197, 201, 291 A.2d 413, 415 (1972).

The plaintiff's counsel argued to the justice that the most critical circumstantial evidence in the case consisted of the contemporaneous medical records, "which in our view clearly established that the injury to the ovarian vein occurred during the cesarean section after the baby was born." The plaintiff submitted that the most significant post-operative note was prepared by Dr. Moore, who, when called into the operating room to assist, was told by Dr. Carcieri and Dr. Hawwa "that the ovarian vein had been lacerated, not that it ruptured spontaneously but that it had been lacerated." Counsel argued:

> "I emphasized to this jury and I emphasize to the Court today that was the single most reliable piece of evidence in this entire case as to when and how this injury occurred. Dr. Moore's motivation at that time was simply to document what he observed, and what he heard when he came in to this critical situation and he clearly documented that Dr. [Hawwa] and Dr. [Carcieri] told him that the vein had been lacerated. It wasn't described that it was torn or that it was cut but that it had been lacerated."

The plaintiff also argued that the defense in this case—"that the spontaneous rupture/abnormal ovarian vein story didn't come about until after the case was brought"—should be seen by the trial justice as a fabrication, "put together by doctors whose testimony should not be believed" because, plaintiff argued, the circumstantial evidence in this case "showed that Dr. Carcieri and Dr. Hawwa, [and] Dr. Moore were not truthful[.]" The trial justice did not address this serious accusation about untruthful testimony, nor did he pass upon the credibility of defendants or weigh their testimony against the circumstantial proof in the documentary evidence. It is my opinion that he overlooked and misconceived this evidence and the issue upon which the motion for a new trial rested.

Critically, before he summarized the testimony, the trial justice stated:

> "The Court's analysis will primarily focus on witnesses who testified regarding the obstetric gynecological standard of care

applicable to the plaintiff's [cesarean] section surgery on March 15, 2006, and whether the injury to the plaintiff's ovarian vein occurred during this surgery."

As noted, the obstetric gynecological standard of care for a cesarean section was not the basis for the new-trial motion. The trial justice did not address the dispute concerning the term "laceration" in the medical records context, nor did he reference what motivated his decision or whether he agreed with the verdict. He simply concluded that the "battle of the experts in this case can best be described as a draw." *See Luanglath*, 749 A.2d at 5 (because the trial justice failed to exercise her independent judgment in passing on the credibility of the witnesses, her denial of the new-trial motion was not accorded deference). In *Luanglath*, this Court remanded the case to the trial justice for a new decision concerning the reliability and credibility of the witnesses. *Id.*

It is my opinion that the trial justice failed in his role as the super juror. He overlooked the probative import of the medical records and thus failed to resolve the critical issue of the credibility of the treating physicians concerning whether the plaintiff's ovarian vein ruptured before the cesarean section or during surgery, which the plaintiff vigorously argued, including the plaintiff's contention that the spontaneous-rupture theory was manufactured after this litigation commenced.

Accordingly, the plaintiff may or may not be entitled to a new trial. The plaintiff is however, deserving of a decision, after a rehearing, in accordance with our settled jurisprudence. Consequently, I concur in the majority's holding that affirms the evidentiary rulings with respect to the photograph of the plaintiff's newborn son and the medical record that depicts his injury. I respectfully dissent from the majority's decision affirming the denial of the plaintiff's motion for a new trial.

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Sevan (Bjorklund) Cappuccilli v. David A. Carcieri, M.D., d/b/a Medical Office of David A. Carcieri, M.D. et al. |
| **Case Number** | No. 2015-46-Appeal. (PC 09-1491) |
| **Date Opinion Filed** | December 15, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Gilbert V. Indeglia |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Daniel A. Procaccini |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Mark B. DeCof, Esq. <br> Douglas E. Chabot, Esq. <br> Michael P. Quinn, Jr., Esq. |
| | For Defendants: <br><br> Ryan K. Deady, Esq. <br> William F. White, Esq. |